Lina M. Brenner (CA Bar No. 191075)
Antony L. Sanacory (GA Bar No. 625195))
Duane Morris LLP
One Market, Spear Tower, Suite 2000
San Francisco, CA  94105-1104
Telephone:  (415) 957.3000
Facsimile:  (415) 957.3001
Email: lmbrenner@duanemorris.com
        alsancory@duanemorris.com

Bruce P. Brown (GA Bar No. 064460)
McKenna Long & Aldridge LLP
Suite 5300, 303 Peachtree Street
Atlanta, Georgia  30308
Telephone: (404) 527-4000
Facsimile:  (404) 527-4198
Email:  bbrown@mckennalong.com

ATTORNEY FOR PLAINTIFFS
IP CO., LLC and SIPCO, LLC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IP CO., LLC and SIPCO, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>CELLNET TECHNOLOGY, INC., TROPOS NETWORKS, INC., HUNT TECHNOLOGIES, LLC and B&L TECH COMPANY, INC.,<br><br>Defendants. | CASE NO. 08-mc-80126-MMC<br><br>CIVIL ACTION FILE NO. 1:06-CV-3048-JEC<br>United States District Court<br>For the Northern District of Georgia<br><br>**DECLARATION OF ANTONY L. SANACORY IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL NON-PARTY ZIGBEE ALLIANCE TO PRODUCE DOCUMENTS RESPONSIVE TO SUBPOENA**<br><br>Date:      August 13, 2008<br>Time:      10:00 a.m.<br>Judge:    Hon. Bernard Zimmerman |

1

I, Antony L. Sanacory, declare as follows:

1.      I am an attorney licensed to practice law in the State of Georgia, and an attorney with the law firm of Duane Morris LLP ("Duane Morris"), counsel of record for Plaintiffs IP CO., LLC and SIPCO, LLC ("Plaintiffs"). I submit this Declaration in support of Plaintiffs' Reply in Support of their Motion to Compel non-party Zigbee Alliance to produce documents responsive to a subpoena issued by this Court on April 11, 2008. The information below is based upon my personal knowledge, or upon information and belief where stated herein. If necessary, I could competently testify to the below.

2.      During a meet and confer with counsel for ZigBee, I explained to ZigBee's counsel why documents responsive to each category of the Subpoena were likely to lead to the discovery of admissible evidence. Specifically, I explained that the underlying lawsuit was a contract/tortious interference lawsuit. I explained that Defendants had contractual obligations with the Plaintiffs and were believed to have breached those obligations (or to have tortiously interfered with other parties' obligations to Plaintiffs) by facilitating the reexamination of the Reexamination Patents. I also explained that Plaintiffs' patent portfolio includes both the Reexamination Patents and the patented inventions of T. David Petite, SIPCO's CEO and a founding member of SIPCO.

3.      On May 21, 2008, I wrote to counsel for ZigBee as follows:
This letter is in reference to the subpoena served by Plaintiffs on ZigBee in the above-referenced lawsuit (the "Civil Action"). The parties agreed that Plaintiffs would review ZigBee's initial production of documents responsive only to category 3 of the subpoena before revisiting the issue of whether Plaintiffs would require production of documents responsive to categories 1 and 2 of the subpoena. We have reviewed the documents produced by ZigBee. Based on this review and our review of documents produced from other sources, it is clear that documents responsive to categories 1 and 2 of the subpoena directly bear on claims and defenses in the Civil Action, and that ZigBee is the most logical source of such documents. Therefore, we ask that ZigBee complete its production of all non-privileged documents, including documents responsive to categories 1 and 2 of the subpoena, by no later than Friday, May 30, 2008.

A true and correct copy of my May 21 Letter is attached hereto as Exhibit A.

///

///

///

///

2

Lina M. Brenner (CA Bar No. 191075)
Antony L. Sanacory (GA Bar No. 625195))
Duane Morris LLP
One Market, Spear Tower, Suite 2000
San Francisco, CA  94105-1104
Telephone:  (415) 957.3000
Facsimile:  (415) 957.3001
Email: lmbrenner@duanemorris.com
         alsanacory@duanemorris.com

Bruce P. Brown (GA Bar No. 064460)
McKenna Long & Aldridge LLP
Suite 5300, 303 Peachtree Street
Atlanta, Georgia  30308
Telephone: (404) 527-4000
Facsimile:  (404) 527-4198
Email:  bbrown@mckennalong.com

ATTORNEY FOR PLAINTIFFS
IP CO., LLC and SIPCO, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IP CO., LLC and SIPCO, LLC,<br><br>              Plaintiffs,<br><br>vs.<br><br>CELLNET TECHNOLOGY, INC., TROPOS NETWORKS, INC., HUNT TECHNOLOGIES, LLC and B&L TECH COMPANY, INC.,<br><br>              Defendants. | CASE NO. 08-mc-80126-MMC<br><br>CIVIL ACTION FILE NO. 1:06-CV-3048-JEC<br>United States District Court<br>For the Northern District of Georgia<br><br>**DECLARATION OF ANTONY L. SANACORY IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO COMPEL NON-PARTY ZIGBEE ALLIANCE TO PRODUCE DOCUMENTS RESPONSIVE TO SUBPOENA**<br><br>Date:      August 13, 2008<br>Time:     10:00 a.m.<br>Judge:    Hon. Bernard Zimmerman |

1

1    4.    After sending that letter, I exchanged voicemails with ZigBee's counsel and we

2    agreed that ZigBee would produce documents responsive to each category of the Subpoena. After

3    receiving a voicemail from ZigBee's counsel, I wrote to ZigBee's counsel as follows:

> Plaintiffs agree to your proposed production date of June 6, 2008. Plaintiffs also agree to your request that ZigBee not be put through the expense of preparing and producing a privilege log, so long as we are in agreement on the issue you and I discussed on the telephone regarding the extent of the privilege. We do not believe that there would be any basis to assert a privilege for communications with (or that were shared with) members of ZigBee. In other words, the attorney-client privilege does not extend to any communications to/from, CC'ing or shared in any way with a member of ZigBee, and we would expect that all such communications be produced. So long as we have agreement on this, Plaintiffs are willing to forego a privilege log.

10    A true and correct copy of counsels' email exchange is attached hereto as Exhibit B.

11    5.    ZigBee's counsel then responded as follows:

> This seems acceptable to ZigBee. However, as I mentioned on your voicemail, we would like a procedure in case any of those documents you referenced are claimed as privileged. Thus, if we claim any of the referenced documents between ZigBee and its members are privileged, is it acceptable to Plaintiffs if we produce a privilege log limited to those documents, if any?

16    A true and correct copy of counsels' email exchange is attached hereto as Exhibit B.

17    6.    After this email exchange, Plaintiffs' counsel agreed to the procedure for logging

18    only third-party communications, and those two-hundred and twenty-three (223) third-party

19    communications are the subject of the current Motion.

20    7.    ZigBee's total document production comprises approximately 737 pages (*pages*,

21    not documents). The production consists largely of multiple copies and versions of the same

22    email chains. Approximately one-hundred and twenty-eight (128) pages of ZigBee's production

23    are simply copies of emails between Plaintiffs' counsel and ZigBee's counsel.

24    8.    After ZigBee alleged that each company identified on the ZigBee Log was part of a

25    joint defense team (or were working for ZigBee's lawyers), Plaintiffs served subpoenas on some

26    of the companies identified on the ZigBee Log and took additional discovery in the underlying

27    lawsuit. Several of the companies identified on the ZigBee Log came forward with testimony and

28

DECLARATION OF ANTHONY L. SANACORY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL

DM1\1368301.1

1  document productions (including some of the documents on ZigBee's Log).

2

3      9.     These companies include Cellnet Technologies, Inc. (a member of ZigBee's board

4  and the defendant that purportedly caused ZigBee to form its legal team), Southern California

5  Edison and Daintree. As part of my responsibilities as counsel for Plaintiffs, I am informed by

6  Plaintiffs' general counsel that he has consulted with another ZigBee member respondent, and

7  another production is expected shortly.

8      10.    I personally discussed the subpoena with SCE's and Daintree's representative and

9  have been personally involved in the discovery with Cellnet in the underlying lawsuit. In the

10  underlying lawsuit, Cellnet has not produced a shred of evidence that I am aware of, through

11  documents or the testimony of its officials that there is or ever was a joint defense agreement or

12  that there was the expectation that its communications with ZigBee lawyers were confidential.

13      11.    Attached hereto as Exhibit C is a true and correct copy of a portion of documents

14  produced by Southern California Edison Company in response to a subpoena served by Plaintiffs.

15      12.    Attached hereto as Exhibit D is a true and correct copy of a portion of documents

16  produced by Daintree Networks, Inc. in response to a subpoena served by Plaintiffs.

17      13.    Neither SCE, Daintree nor Cellnet have asserted that they view DLA Piper as their

18  lawyers or that they were retained or working for ZigBee or its lawyers.

19      14.    Neither SCE, Daintree nor Cellnet have asserted the common interest doctrine, the

20  attorney-client privilege or work product doctrine as a basis for withholding some of the very

21  documents listed on the ZigBee Log.

22      15.    As part of my responsibilities as counsel for Plaintiffs, I am informed by SIPCO's

23  General Counsel that another ZigBee member respondent specifically has disavowed being a party

24  to any joint defense agreement with ZigBee.

25      16.    To date, Plaintiffs have been unable to obtain the rest of the documents on the

26  ZigBee Log through alternative means of discovery.

27      17.    Attached hereto as Exhibit E is a true and correct copy of the Corporate ByLaws of

28  ZigBee Alliance, which I personally obtained from ZigBee's website.

4

18.     Attached hereto as Exhibit F is a true and correct copy of the ZigBee Alliance Participation Agreement, which I personally obtained from ZigBee's website.

19.     Out of an abundance of caution concerning the parameters of the Protective Order in the underlying case, we have abstained from submitting the deposition testimony of persons representing Zigbee members.  I attended the deposition, which forms the basis for the above statements concerning its content.  Should the Court wish to conduct an *in camera* inspection of this testimony, Plaintiffs will submit same.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 23, 2008, at Atlanta, Georgia.




By:  _____
                Antony L. Sanacory

DECLARATION OF ANTHONY L. SANACORY IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL
DM1\1368301.1

*Exhibit A*

## Sanacory, Antony L.

| | |
|---|---|
| **From:** | Sanacory, Antony L. |
| **Sent:** | Wednesday, May 21, 2008 1:52 PM |
| **To:** | 'Taufer, Paul A.'; 'Burns IV, Michael' |
| **Cc:** | 'Brown, Bruce' |
| **Subject:** | Civil Action N.D.Ga. 06-3048 - ZigBee Subpoena |
| **Attachments:** | 20080521144318546.pdf |

Please review the attached correspondence.



Antony L. Sanacory
Associate

Duane Morris LLP
Atlantic Center Plaza
1180 West Peachtree Street NW, Suite 700
Atlanta, GA 30309-3448
P: 404.253.6939
F: 404.253.6901

- ❷ BIO
- ❷ E-MAIL
- ❷ WEB SITE
- ❷ VCARD

DuaneMorris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
LOS ANGELES
CHICAGO
HOUSTON
HANOI
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BALTIMORE
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
WILMINGTON
PRINCETON
LAKE TAHOE
HO CHI MINH CITY

ANTONY L. SANACORY
DIRECT DIAL: 404.253.6939
E-MAIL: alsanacory@duanemorris.com

www.duanemorris.com

May 21, 2008

**BY ELECTRONIC AND U.S. MAIL**

Paul Taufer
DLA Piper US LLP
One Liberty Place 1650 Market Street, Suite 4900
Philadelphia, Pennsylvania 19103-7300

Re:    IP Co., LLC and SIPCO, LLC v. Cellnet Technology, Inc.,
       N.D.Ga. Civ. Action 06-3048

Dear Paul:

This letter is in reference to the subpoena served by Plaintiffs on ZigBee in the above-referenced lawsuit (the "Civil Action"). The parties agreed that Plaintiffs would review ZigBee's initial production of documents responsive only to category 3 of the subpoena before revisiting the issue of whether Plaintiffs would require production of documents responsive to categories 1 and 2 of the subpoena. We have reviewed the documents produced by ZigBee. Based on this review and our review of documents produced from other sources, it is clear that documents responsive to categories 1 and 2 of the subpoena directly bear on claims and defenses in the Civil Action, and that ZigBee is the most logical source of such documents. Therefore, we ask that ZigBee complete its production of all non-privileged documents, including documents responsive to categories 1 and 2 of the subpoena, by no later than Friday, May 30, 2008.

Please call me if you have any questions.

Sincerely,

Antony L. Sanacory

Antony L. Sanacory

*Exhibit B*

**Sanacory, Antony L.**

| | |
|---|---|
| **From:** | Sanacory, Antony L. |
| **Sent:** | Tuesday, May 27, 2008 11:34 AM |
| **To:** | 'Michael.Burns@dlapiper.com' |
| **Cc:** | 'Paul.Taufer@dlapiper.com' |
| **Subject:** | Re: Civil Action N.D.Ga. 06-3048 - ZigBee Subpoena |

Michael,

I cannot imagine a scenario where a privilege would apply to communications w/members. But as long as the privilege log covers any and all communications w/members that are being withheld on the basis of an asserted privilege, including those communications to which any counsel may have been a party, that is fine.

Tony

Antony L. Sanacory
Duane Morris LLP
1180 West Peachtree Street
Atlanta, Georgia 30309
(p) 404.253.6939
(f) 404.253.6901


----- Original Message -----
From: Burns IV, Michael <Michael.Burns@dlapiper.com>
To: Sanacory, Antony L.
Cc: Taufer, Paul A. <Paul.Taufer@dlapiper.com>
Sent: Tue May 27 10:32:41 2008
Subject: RE: Civil Action N.D.Ga. 06-3048 - ZigBee Subpoena

Tony,

This seems acceptable to ZigBee.  However, as I mentioned on your voicemail, we would like a procedure in case any of those documents you referenced are claimed as privileged.  Thus, if we claim any of the referenced documents between ZigBee and its members are privileged, is it acceptable to Plaintiffs if we produce a privilege log limited to those documents, if any?

Please let me know.

Mike



 <http://www.dlapiper.com/>
Michael L. Burns IV
Associate

DLA Piper US LLP
One Liberty Place

1

1650 Market Street - Suite 4900
Philadelphia, Pennsylvania 19103
215.656.2443 T
215.606.2143 F
Michael.Burns@dlapiper.com
www.dlapiper.com <http://www.dlapiper.com/>  | My Bio
<http://www.dlapiper.com/us/people/detail.aspx?attorney=3434>

---

From: Sanacory, Antony L. [mailto:ASanacory@duanemorris.com]
Sent: Monday, May 26, 2008 2:37 PM
To: Taufer, Paul A.; Burns IV, Michael
Subject: RE: Civil Action N.D.Ga. 06-3048 - ZigBee Subpoena

Michael,

Plaintiffs agree to your proposed production date of June 6, 2008.  Plaintiffs also agree to your request that ZigBee not be put through the expense of preparing and producing a privilege log, so long as we are in agreement on the issue you and I discussed on the telephone regarding the extent of the privilege.  We do not believe that there would be any basis to assert a privilege for communications with (or that were shared with) members of ZigBee.  In other words, the attorney-client privilege does not extend to any communications to/from, CC'ing or shared in any way with a member of ZigBee, and we would expect that all such communications be produced.  So long as we have agreement on this, Plaintiffs are willing to forego a privilege log.

Feel free to call with any questions,

Tony

---

From: Sanacory, Antony L.
Sent: Wednesday, May 21, 2008 1:52 PM
To: 'Taufer, Paul A.'; Burns IV, Michael
Cc: 'Brown, Bruce'
Subject: Civil Action N.D.Ga. 06-3048 - ZigBee Subpoena

Please review the attached correspondence.

<http://www.duanemorris.com/>

2

Antony L. Sanacory
Associate


Duane Morris LLP
Atlantic Center Plaza
1180 West Peachtree Street NW, Suite 700
Atlanta, GA 30309-3448
P: 404.253.6939
F: 404.253.6901


BIO <http://duanemorris.com/attorneys/attorney4911.html>
E-MAIL <mailto:ASanacory@duanemorris.com>
WEB SITE <http://www.duanemorris.com/>
VCARD <http://www.duanemorris.com/attorneys/vcard/atty4911.vcf>

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

Please consider the environment before printing this email.

---

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. To contact our email administrator directly, send to postmaster@dlapiper.com

Thank you.

---

*Exhibit C*

**Sanacory, Antony L.**

| | |
|---|---|
| **From:** | David.Coher@sce.com |
| **Sent:** | Thursday, July 17, 2008 7:52 PM |
| **To:** | Sanacory, Antony L. |
| **Subject:** | Document Subpoena |
| **Attachments:** | Docs for IP Co.pdf |

Tony,

Per our telephone conversation of this afternoon, Southern California Edison Company (SCE) is providing the attached as an initial response to the Subpoena of SCE in the *IP Co., LLC, et al. v. Cellnet Technology, Inc., et al.* case (Case # 1:06-CV-3048 JEC). SCE reserves all objections and rights in responding to this subpoena. By our agreement, SCE has up to and including August 15, 2008 to provide a more complete and final response to this subpoena.

If this does not comport with your recollection, please contact me immediately. Thank you.

David B. Coher
Attorney, Law Department
Southern California Edison
2244 Walnut Grove Avenue
Rosemead, California 91770
Telephone - (626) 302-6060
Facsimile - (626) 302-3990

REDACTED

SCE00001



REDACTED



"Bill Chase"
<bchase@inventures.com>

04/03/2008 06:20 PM

To     <ed.may@ltron.com>, <bvos@comverge.com>,
<DavidL.Davidson@eaton.com>,
<Robby.Simpson@cellnethunt.com>,
<Ellie.Doyle@cellnethunt.com>,
<jeremy.mcdonald@sce.com>, <florence.pingis@sce.com>
"Dennis Gallitano"
<Dennis.Gallitano@gallitanooconnor.com>, "Marc Lawlor"

cc     <Marc.Lawlor@gallitanooconnor.com>, "Taufer, Paul A."
<Paul.Taufer@dlapiper.com>, "Bob Heile"
<bheile@ieee.org>, "Brent Hodges"
<bhodges@inventures.com>, "Bill Chase"
<bchase@inventures.com>

Subject     ZigBee Alliance Conference Call

Jeremy, the email to Florence bounced - will you please forward it to her?  Thanks.
---------------------------------------------

Hi All,

The ZigBee Alliance wishes to facilitate a call among some of the member companies to discuss some possible strategies around recent IPCO (aka IntusIQ http://theipco.com/home.html) activity.  I have spoken with each of you individually and there is some good consensus around the value of having this conference call.

There are three patents that have been discussed and many of you asked for this information.  The first two are currently under re-examination by the USPTO and the information is available on the USPTO website.  The third patent was cited in a recent press release:

U.S Patent Nos. 6,044,062 and 6,249,516 - under re-examination
U.S. Patent No. 7,054,271 - cited in the release

The call time has shifted a bit from the original proposal in order to accommodate participants as follows:

Date: Tuesday April 8, 2008
Time:  12:00 - 1:00 pm Pacific Daylight Time (2:00 CDT, 3:00 EDT, 9:00 CET)
Conference Access:
Toll Free - 1-888-384-9090
International - 1-719-955-1560
Passcode - 779874#

I hope this works for everyone.  I look forward to a productive call on Tuesday.

Best Regards,
Bill
Executive Director, ZigBee Alliance

-------------------------------------------------------------

**Bill Chase**
Vice President
**Global Inventures, Inc. ([www.inventures.com](www.inventures.com))**
*Accelerating Results Through Collaboration*
2400 Camino Ramon, Suite 375 San Ramon, CA  94583 USA
Phone: +1.925.275.6655
Cell:    +1.925.381.7668

-------------------------------------------------------------

*Exhibit D*

**From:** "Bill Chase" <bchase@inventures.com>
**Date:** April 7, 2008 2:58:51 PM PDT
**To:** "Bob Heile" <bheile@ieee.org>, <zsmith@daintree.net>,
<Ed.Callaway@motorola.com>, <dsturek@ti.com>, <skip.ashton@ember.com>
**Cc:** "Dennis Gallitano" <Dennis.Gallitano@gallitanooconnor.com>,
<paul.taufer@dlapiper.com>, "Marc Lawlor" <Marc.Lawlor@gallitanooconnor.com>
**Subject: RE: follow-up IPCO call April 9 10am pacific**

Hi All,

A couple of quick reminders.  We talked about this already, but you were asked
to exam the patent in question at the request of ZigBee counsel - Dennis
Gallitano and Paul Taufer.  Secondly nothing should be in writing or
email.  Third, there is a good chance counsel will join the call to remind you of
same.  Thanks in advance.


Bill



**From:** Bob Heile [mailto:bheile@ieee.org]
**Sent:** Friday, April 04, 2008 9:29 AM
**To:** zsmith@daintree.net; Ed.Callaway@motorola.com; dsturek@ti.com;
skip.ashton@ember.com; bheile@ieee.org; Bill Chase
**Subject:** follow-up IPCO call April 9 10am pacific


Wednesday, April 9, 10am pacific

ZARC number once again
**U.S. Toll-free:** +1.800.353.1667
**International:** +1.719.457.0706
**Participant Code:** 751654


Zachary give me a call I will fill you in


Bob Heile, Ph.D    Chairman, ZigBee Alliance    Chair, IEEE 802.15
Working Group on Wireless Personal Area Networks    11 Louis Road

Attleboro, MA   02703    USA    Mobile: +1-781-929-4832
email:    bheile@ieee.org

**From:** Bob Heile <bheile@ieee.org>
**Date:** April 4, 2008 9:29:07 AM PDT
**To:** zsmith@daintree.net, Ed.Callaway@motorola.com, dsturek@ti.com, skip.ashton@ember.com, bheile@ieee.org, bchase@inventures.com
**Subject: follow-up IPCO call April 9 10am pacific**

Wednesday, April 9, 10am pacific

ZARC number once again
**U.S. Toll-free:** +1.800.353.1667
**International:** +1.719.457.0706
**Participant Code:** 751654


Zachary give me a call I will fill you in


Bob Heile, Ph.D    Chairman, ZigBee Alliance    Chair, IEEE 802.15
Working Group on Wireless Personal Area Networks    11 Louis Road
    Attleboro, MA    02703    USA    Mobile: +1-781-929-4832
email:    bheile@ieee.org

**From:** Zachary Smith <zsmith@daintree.net>
**Date:** April 3, 2008 1:50:14 PM PDT
**To:** Bob Heile <bheile@ieee.org>
**Cc:** dsturek@ti.com, skip.ashton@ember.com, Ed.Callaway@motorola.com, bchase@inventures.com
**Subject: Re: IPCO strikes again**

I too can make this, at least in theory.

　　z

On Apr 3, 2008, at 1:56 PM, Bob Heile wrote:
Skip, Zachary, Don and Ed

We have another IPCO situation that I would like to discuss. Would some or all of you be available for a call on Friday at 8am pacific?  Please RSVP.

I suggest we use the ZARC bridge

**U.S. Toll-free:** +1.800.353.1667
**International:** +1.719.457.0706
**Participant Code:** 751654

Bob


Bob Heile, Ph.D    Chairman, ZigBee Alliance    Chair, IEEE 802.15 Working Group on Wireless Personal Area Networks    11 Louis Road    Attleboro, MA  02703   USA    Mobile: +1-781-929-4832
email:   bheile@ieee.org


Zachary Smith - CTO
http://www.daintree.net/
zsmith@daintree.net

**From:** "Callaway Ed-eaim148" <Ed.Callaway@motorola.com>
**Date:** April 3, 2008 1:04:07 PM PDT
**To:** "Bob Heile" <bheile@ieee.org>, <dsturek@ti.com>, <zsmith@daintree.net>, <skip.ashton@ember.com>
**Cc:** <bchase@inventures.com>
**Subject:** RE: IPCO strikes again

I, too, can make it, although I may still be at the car service shop.

Ed Callaway, Ph.D., P.E.
Fellow of the Technical Staff
Florida Communication Research Lab, Motorola Labs
Phone: +1-954-723-8341
Mobile: +1-954-608-7537
Fax: +1-954-723-3712
ed.callaway@motorola.com

**From:** Bob Heile [mailto:bheile@ieee.org]
**Sent:** Thursday, April 03, 2008 4:56 PM
**To:** dsturek@ti.com; zsmith@daintree.net; skip.ashton@ember.com; Callaway Ed-eaim148
**Cc:** bheile@ieee.org; bchase@inventures.com
**Subject:** IPCO strikes again
**Importance:** High

Skip, Zachary, Don and Ed

We have another IPCO situation that I would like to discuss. Would some or all of you be available for a call on Friday at 8am pacific?  Please RSVP.

I suggest we use the ZARC bridge

**U.S. Toll-free:** +1.800.353.1667
**International:** +1.719.457.0706
**Participant Code:** 751654

Bob


Bob Heile, Ph.D    Chairman, ZigBee Alliance    Chair, IEEE 802.15
Working Group on Wireless Personal Area Networks    11 Louis Road
    Attleboro, MA  02703    USA    Mobile: +1-781-929-4832
email:    bheile@ieee.org

**From:** "Skip Ashton" <skip.ashton@ember.com>
**Date:** April 3, 2008 1:01:07 PM PDT
**To:** "Sturek, Don" <dsturek@ti.com>, "Bob Heile" <bheile@ieee.org>,
<zsmith@daintree.net>, <Ed.Callaway@motorola.com>
**Cc:** <bchase@inventures.com>
**Subject:** RE: IPCO strikes again

I can do Friday at 8am pacific

Skip

**From:** Sturek, Don [mailto:dsturek@ti.com]    **Sent:** Thursday, April 03, 2008
3:57 PM    **To:** Bob Heile; zsmith@daintree.net; Skip Ashton;
Ed.Callaway@motorola.com    **Cc:** bchase@inventures.com    **Subject:** RE: IPCO
strikes again

I can do Friday 8 am......

Don

**From:** Bob Heile [mailto:bheile@ieee.org]    **Sent:** Thursday, April 03, 2008
1:56 PM    **To:** Sturek, Don; zsmith@daintree.net; skip.ashton@ember.com;
Ed.Callaway@motorola.com    **Cc:** bheile@ieee.org; bchase@inventures.com
**Subject:** IPCO strikes again    **Importance:** High

Skip, Zachary, Don and Ed    We have another IPCO situation that I
would like to discuss. Would some or all of you be available for a call
on Friday at 8am pacific?  Please RSVP.    I suggest we use the
ZARC bridge    **U.S. Toll-free:** +1.800.353.1667    **International:**
+1.719.457.0706    **Participant Code:** 751654    Bob

Bob Heile, Ph.D    Chairman, ZigBee Alliance    Chair, IEEE 802.15
Working Group on Wireless Personal Area Networks    11 Louis Road
   Attleboro, MA  02703   USA   Mobile: +1-781-929-4832
email:   bheile@ieee.org

**From:** "Sturek, Don" <dsturek@ti.com>
**Date:** April 3, 2008 12:57:23 PM PDT
**To:** "Bob Heile" <bheile@ieee.org>, <zsmith@daintree.net>,
<skip.ashton@ember.com>, <Ed.Callaway@motorola.com>
**Cc:** <bchase@inventures.com>
**Subject: RE: IPCO strikes again**

I can do Friday 8 am......

Don


**From:** Bob Heile [mailto:bheile@ieee.org]    **Sent:** Thursday, April 03, 2008
1:56 PM   **To:** Sturek, Don; zsmith@daintree.net; skip.ashton@ember.com;
Ed.Callaway@motorola.com   **Cc:** bheile@ieee.org; bchase@inventures.com
**Subject:** IPCO strikes again   **Importance:** High

Skip, Zachary, Don and Ed      We have another IPCO situation that I
would like to discuss. Would some or all of you be available for a call
on Friday at 8am pacific?  Please RSVP.      I suggest we use the
ZARC bridge     **U.S. Toll-free:** +1.800.353.1667     **International:**
+1.719.457.0706    **Participant Code:** 751654      Bob
Bob Heile, Ph.D   Chairman, ZigBee Alliance   Chair, IEEE 802.15
Working Group on Wireless Personal Area Networks    11 Louis Road
   Attleboro, MA   02703   USA   Mobile: +1-781-929-4832
email:   bheile@ieee.org

**From:** Bob Heile <bheile@ieee.org>
**Date:** April 3, 2008 1:56:13 PM PDT
**To:** dsturek@ti.com, zsmith@daintree.net, skip.ashton@ember.com,
Ed.Callaway@motorola.com
**Cc:** bheile@ieee.org, bchase@inventures.com
**Subject: IPCO strikes again**

Skip, Zachary, Don and Ed

We have another IPCO situation that I would like to discuss. Would
some or all of you be available for a call on Friday at 8am
pacific?  Please RSVP.

I suggest we use the ZARC bridge

**U.S. Toll-free:** +1.800.353.1667
**International:** +1.719.457.0706
**Participant Code:** 751654

Bob


Bob Heile, Ph.D   Chairman, ZigBee Alliance    Chair, IEEE 802.15
Working Group on Wireless Personal Area Networks    11 Louis Road
   Attleboro, MA   02703   USA   Mobile: +1-781-929-4832
email:   bheile@ieee.org

**From:** Bob Heile <bheile@ieee.org>
**Date:** January 24, 2008 5:10:08 PM PST
**To:** Zachary Smith <zsmith@daintree.net>, Bob Heile <bheile@ieee.org>
**Subject: Re: The word on the street**

Thanks for the heads up. Given that the Ipco patents have been thrown out and all the other patents that have surfaced have related to things like dimmers and antennas in the same box and not directly reading on the ZigBee spec, it will be interesting to see what surfaces. Absent any direct identification of patents in the interim, I guess we will just have to wait and see.

At 11:11 AM 1/24/2008 -0800, Zachary Smith wrote:
So I was just talking with a guy - I probably shouldn't say who since the conversation was covered by NDA and was assumed to be in strict confidence, but suffice it to say that:

1) You know him, and
2) He works for a large US company that has been a tireless supported of ZigBee, 15.4 and wireless in general.

He said something very interesting.

Basically what he said was that there is some concern on the business side that ZigBee is standing in the middle of a patent "mine field" - his words - and that the first strong product out of the chute is going to be subject to a blizzard of patent infringement suits. He also said that some people in the biz think 6LowPAN (or however you capitalize it) is a better alternative because of this.

Just thought you should know,

    z

Zachary Smith - CTO

http://www.daintree.net/
zsmith@daintree.net


Bob Heile, Ph.D    Chairman, ZigBee Alliance    Chair, IEEE
802.15 Working Group on Wireless Personal Area Networks    11 Louis
Road    Attleboro, MA   02703   USA   Mobile: +1-781-929-4832
email:   bheile@ieee.org

*Exhibit E*

# CORPORATE BYLAWS

## of

## ZigBee Alliance

**(a nonprofit mutual benefit corporation)**

# TABLE OF CONTENTS

Page

**ARTICLE I**    **OFFICES** ........................................................................................... 1
   1.1    Principal Office .................................................................................. 1
   1.2    Other Offices ...................................................................................... 1

**ARTICLE II**    **PURPOSES** ....................................................................................... 1
   2.1    Purposes .............................................................................................. 1

**ARTICLE III**    **MEMBERSHIP** ................................................................................ 2
   3.1    Classes of Membership ...................................................................... 2
   3.2    Membership Qualifications ................................................................ 2
   3.3    Admission to Membership .................................................................. 3
   3.4    Fees, Dues and Assessments .............................................................. 3
   3.5    Termination of Membership ............................................................... 3
         3.5.1    Resignation ...................................................................... 3
         3.5.2    Expiration and Disqualification ..................................... 3
         3.5.3    Dues and Assessments .................................................... 3
         3.5.4    Termination of the Promoter Member Agreement ......... 3
   3.6    Non-Liability ...................................................................................... 3
   3.7    Nontransferability .............................................................................. 3
   3.8    Distribution of Assets Upon Dissolution .......................................... 4

**ARTICLE IV**    **MEMBERSHIP MEETINGS** ........................................................... 4
   4.1    Place of Meetings ............................................................................... 4
   4.2    Regular Meetings ............................................................................... 4
   4.3    Special Meetings ................................................................................ 4
   4.4    Notice of Meetings ............................................................................. 4
   4.5    Adjourned Meetings ........................................................................... 5
   4.6    Quorum ............................................................................................... 5
   4.7    Voting ................................................................................................. 5
   4.8    Action Without Meeting by Written Ballot ....................................... 5
   4.9    Proxies ................................................................................................ 6
   4.10   Conduct of Meetings .......................................................................... 6

**ARTICLE V**    **BOARD OF DIRECTORS** ................................................................ 6
   5.1    Powers ................................................................................................ 6
   5.2    Number and Composition of Board of Directors ............................... 6
   5.3    Alternate Directors ............................................................................. 7
         5.3.1    Alternate Directors; Voting ............................................ 7
         5.3.2    Role of Alternate Director .............................................. 7
         5.3.3    Application of Bylaws ..................................................... 7
   5.4    Observers ............................................................................................ 7
   5.5    Restrictions on Eligibility to Serve as a Director; Control Groups ... 7

Page

| 5.6 | Vacancies | 7 |
| 5.7 | Place of Meeting | 8 |
| 5.8 | Special Meetings | 8 |
| 5.9 | Notice of Meetings; Attendance | 8 |
| 5.10 | Consent to Meetings | 8 |
| 5.11 | Action Without Meeting | 8 |
| 5.12 | Telephonic Meetings | 8 |
| 5.13 | Quorum | 9 |
| 5.14 | Adjournment | 9 |
| 5.15 | Fees and Compensation | 9 |
| 5.16 | Indemnity for Litigation | 9 |
| 5.17 | Standard of Conduct | 9 |
| 5.18 | Self-Dealing Transactions | 10 |
| | 5.18.1 Membership Approval | 10 |
| | 5.18.2 Board or Committee Approval | 10 |
| | 5.18.3 Just and Reasonable Contract | 10 |
| 5.19 | Resignation and Removal | 11 |
| | 5.19.1 Resignation | 11 |
| | 5.19.2 Removal | 11 |
| 5.20 | Advisory Board | 11 |
| **ARTICLE VI** | **OFFICERS** | 11 |
| 6.1 | Officers | 11 |
| 6.2 | Election | 11 |
| 6.3 | Removal and Resignation | 12 |
| | 6.3.1 Removal | 12 |
| | 6.3.2 Resignation | 12 |
| 6.4 | Vacancies | 12 |
| 6.5 | Chairman | 12 |
| 6.6 | Vice Chairman | 12 |
| 6.7 | Chief Financial Officer/Treasurer | 12 |
| 6.8 | Secretary | 12 |
| **ARTICLE VII** | **COMMITTEES AND WORKING GROUPS** | 13 |
| 7.1 | Appointment of Committees | 13 |
| 7.2 | Powers and Authority of Committees | 13 |
| 7.3 | Technical Steering Committee | 13 |
| 7.4 | Working Groups | 14 |
| 7.5 | Compensation | 14 |
| **ARTICLE VIII** | **IPR POLICY AND APPROVAL OF SPECIFICATIONS** | 14 |
| 8.1 | General | 14 |
| 8.2 | Modifications to the IPR Policy | 14 |
| 8.3 | Application of Modified IPR Policy | 14 |

**Page**

8.4    Approval of Specifications ........................................................................ 15

**ARTICLE IX    MISCELLANEOUS** ................................................................ 15
9.1    Fiscal Year ............................................................................................. 15
9.2    Inspection of Corporate Records ............................................................ 15
9.3    Representation of Shares of Other Corporations ..................................... 15
9.4    Checks, Drafts, Etc. ............................................................................... 15
9.5    Execution of Contracts............................................................................ 15
9.6    Corporate Loans, Guarantees and Advances ........................................... 16
9.7    Inspection and Disclosure ...................................................................... 16
9.8    Not For Profit Status .............................................................................. 16
9.9    Forms of Notice ..................................................................................... 16
9.10   Severability ........................................................................................... 16

**ARTICLE X    EFFECTIVE DATE AND AMENDMENT** .................................. 16
10.1   Effective Date ........................................................................................ 16
10.2   Amendments .......................................................................................... 16

# CORPORATE BYLAWS

## of

# ZIGBEE ALLIANCE

### (a nonprofit mutual benefit corporation)

## ARTICLE I
## OFFICES

**1.1**    **Principal Office**.  The principal office for the transaction of the business of this Corporation is fixed and located at 2694 Bishop Dr., Suite 275, San Ramon, CA, USA 94583. The Board of Directors is hereby granted full power and authority to change the said principal office from one location to another.

**1.2**    **Other Offices**.  Branch or subordinate offices may at any time be established by the Board of Directors at any place or places where this Corporation is qualified to do business.

## ARTICLE II
## PURPOSES

**2.1**    **Purposes**.  The Corporation is a non-profit mutual benefit corporation formed to promote the use of two-way wireless communications standards for consumer electronics, home and building automation, industrial controls, PC peripherals, medical sensor applications, toys and other related applications.

The purposes for which the Corporation is organized are to:

(a)    Bring about the existence of a broad range of interoperable consumer and industrial devices by promoting open industry specifications for unlicensed, untethered peripheral, control and entertainment devices;

(b)    Provide a forum and environment whereby the Corporation's Members may meet to approve suggested revisions and enhancements that evolve the relevant specifications; make appropriate submissions to established agencies and bodies with the purpose of ratifying these specifications as an international standard; and provide a forum whereby users may meet with developers and providers of related products and services to identify requirements for interoperability and general usability;

(c)    Educate the business and consumer communities as to the value, benefits and applications for wireless consumer products and services through public statements,

publications, trade shows demonstrations, seminar sponsorships and other programs established by the Corporation;

    (d)    Protect the needs of consumers and increase competition among vendors by supporting the creation and implementation of uniform, industry-standard conformance test procedures and processes which assure the interoperability of wireless consumer products and services;

    (e)    Maintain relationships and liaison with educational institutions, government research institutes, other technology consortia, and other organizations that support and contribute to the development of the specifications and standards; and

    (f)    Foster competition in the development of new products and services based on specifications developed by the Corporation in conformance with all applicable antitrust laws and regulations.

# ARTICLE III
# MEMBERSHIP

**3.1**    **Classes of Membership**.  There shall be only one class of Members in the Corporation within the meaning of Section 5056 of the California Nonprofit Corporation Law, and such Members shall be known as *"Promoter Members."*  The Corporation may, pursuant to resolutions adopted by the Board of Directors, create one or more classes of non-member participants of the Corporation (collectively, *"Participants"*).  Participants shall have only the rights and privileges specifically given to them by the resolutions adopted by the Board of Directors, and shall be subject to any conditions imposed thereon by the Board of Directors. Participants shall not be entitled to any voting rights with respect to the business or proceedings of the Corporation, including without limitation, any matters relating to the adoption of a deliverable or any other matters presented to the Corporation and/or the Promoter Members for voting or election. Any classes of Participants may be referred to as *"Participants,"* *"Members,"* *"Associates"* or by any other designation given to them by the Board of Directors; however all such classes of Participants shall not be considered "statutory members" within the meaning of Section 5056 or any other applicable section of the California Nonprofit Corporation Law.  Notwithstanding the foregoing, this **Section 3.1** and **Sections 3.4** through **3.8** and **Articles 7** through **10** of these Bylaws shall apply to such Participants and references to *"Members"* in therein shall also be deemed to include such Participants.  Otherwise, all references to *"Members"* in these Bylaws shall be limited to Promoter Members only.

**3.2**    **Membership Qualifications**.  Promoter Members of the Corporation shall be those entities listed on the Promoter Membership List maintained by the Corporation.  Additional Promoter Members may be admitted pursuant to **Section 3.3**.  A Promoter Member shall automatically cease to be a Promoter Member upon the occurrence of an event set forth in **Section 3.5**.

**3.3    Admission to Membership**.  Admission to the Promoter Membership shall require a minimum two-thirds (2/3) vote of the Board of Directors, and such a determination shall be based on the then-current criteria and conditions of membership adopted by the Board of Directors.

**3.4    Fees, Dues and Assessments**.  The Board of Directors shall determine the initial membership fees, dues and assessments for membership and/or participation in the Corporation. Fees, dues and assessments for membership in the Corporation may be increased or decreased by the Board, in its discretion, at any time.  Membership in the Corporation will automatically renew on an annual basis, and membership fees will be invoiced at each subsequent anniversary period.  Members shall be obligated to make payment of annual fees, dues and assessments within thirty (30) calendar days of written notice of such fees, dues or assessments.

**3.5    Termination of Membership**.  The membership of any Member shall terminate upon the occurrence of any one or more of the conditions set forth in this **Section 3.5**.  Upon termination or expiration of the status of a Member in the Corporation, all rights and privileges associated with being a Member shall terminate:

> **3.5.1    Resignation**.  A Member may resign from the Corporation at any time by filing a resignation letter with the Chairperson or Secretary of the Corporation.  No *pro rata* refund of any  membership fees, dues or assessments shall be made for the balance of the calendar year in which the resignation is effective.

> **3.5.2    Expiration and Disqualification**.  A membership issued for a period of time shall expire when such period of time has elapsed unless the membership is renewed.

> **3.5.3    Dues and Assessments**.  Membership shall terminate upon the failure of the Member to pay any fees, dues or assessments within the time periods established by the Board of Directors.

> **3.5.4    Termination of the Promoter Member Agreement**.  Membership shall terminate upon termination or expiration of the applicable Promoter Member Agreement or Participation Agreement.

**3.6    Non-Liability**.  No Member shall be personally liable for the debts, liabilities or obligations of this Corporation.

**3.7    Nontransferability**.  No Member may transfer for value or otherwise a membership interest or any right arising therefrom, and all rights of membership shall cease upon the Member's bankruptcy, resignation, expulsion or dissolution.  In the case of a merger or acquisition of a Member company by another company, the rights of membership shall be continued to the new legal entity.

**3.8    Distribution of Assets Upon Dissolution.** Upon a dissolution or liquidation of this Corporation, and after all of the known debts and liabilities of this Corporation have been paid or adequately provided for in accordance with Section 8713 of the California Nonprofit Corporation Law, the Board of Directors shall: (a) return to the Members any unused portions of dues paid by Members for any particular fiscal year; and (b) thereafter, transfer remaining assets and/or intellectual property rights of the Corporation which are not appropriate for transfer to the general public, such as any trademarks or logos of the Corporation, to another Section 501(c)(6) organization, as determined by the Board of Directors whose purposes are similar to the Corporation. Any such assets not disposed of in accordance with the aforementioned procedures shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then located to such organization or organizations, as said court shall determine, that are organized and operated exclusively for such purposes. No part of the Corporation's net earnings will inure to the benefit of any Member, Director or any third person.

## ARTICLE IV
## MEMBERSHIP MEETINGS

**4.1    Place of Meetings.** All meetings of Members shall be held at any place which may be designated by the Board of Directors pursuant to the authority hereinafter granted to the said Board of Directors, or by the written consent of all Members entitled to vote thereat, given either before or after the meeting and filed with the Secretary of the Corporation.

**4.2    Regular Meetings.** Regular meetings of Members of the Corporation shall be held at such dates and at such times and places as determined by resolution of the Board of Directors. Additional Member meetings may be set as determined by the Board of Directors and pursuant to notification as defined in these Bylaws.

**4.3    Special Meetings.** Special meetings of Members, for any lawful purpose or purposes whatsoever, may be called at any time by the Chairman, the Board of Directors, or by five percent (5%) or more of Members entitled to vote. Notice of such request must be submitted to the Chairman, the Vice-Chairman or Secretary. The notice must state the business to be transacted at the special meeting. It shall be the duty of the officer to cause notice to be given, within twenty (20) days from receipt of such a request, to the Members entitled to vote at the meeting scheduled and to be held not less than thirty-five (35) days nor more than ninety (90) days after the receipt of such a request. A quorum of Members must be present at the special meeting pursuant to **Section 4.6** in order to conduct the business of the Corporation.

**4.4    Notice of Meetings.** A notice of each annual meeting, written ballot for election of Directors or otherwise, if any, and special meeting shall be given by the Chairman or, in case of his failure or refusal, by any other officer or any Director. Each such notice shall specify: (a) the place, time, day and hour of the meeting or the date on which the ballot shall be returned, if applicable; (b) in the case of an annual meeting at which Directors shall be elected, shall specify the names of all those who are candidates for election of Directors and the agenda of the meeting as determined at the time the notice is given; and (c) in the case of special meetings, the nature of

the business to be transacted thereat. Such notice shall be given to every Member of the Corporation who, on the record date for notice of the meeting, is entitled to vote thereat. Such notice shall be given at least ten (10) days but no more than ninety (90) days prior to the date fixed for such meeting; provided, however, that if notice is given by mail and is not sent first class, registered or certified mail, notice shall be given not less than twenty (20) days before the meeting.

**4.5    Adjourned Meetings**. Any Members' meeting, annual or special, whether or not a quorum is present, may be adjourned from time to time by the vote of a majority of the Members, entitled to vote thereat, either present in person or represented by proxy thereat, but in the absence of a quorum no other business may be transacted at any such meeting. Annual and special meetings may not be adjourned for more than forty-five (45) days to another time or place. It shall not be necessary to give any such notice of the time and place of the adjourned meeting or of the business to be transacted thereat, other than by an announcement at the meeting at which such adjournment is taken. If after the adjournment a new record date is fixed for notice or voting, a notice of the adjourned meeting shall be given to each Member who, on the record date for notice of the meeting, is entitled to vote at the meeting.

**4.6    Quorum**. The presence in person or by proxy of a majority of the Members of the Corporation entitled to vote shall constitute a quorum for the transaction of business. The Members present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum, if any action taken (other than adjournment) is approved by at least a majority of the Members required to constitute a quorum. The presence of an authorized representative of a Member shall constitute presence of the Member for purposes of determining the establishment of a quorum.

**4.7    Voting**. Each Promoter Member in good standing (i.e. Promoter Members who have paid their membership fees, dues and assessments in accordance with these Bylaws and whose membership has not been terminated pursuant to **Section 3.5**) is entitled to one (1) vote on each matter submitted to a vote of the Members. Voting shall be by voice vote, unless the Chairman of the Corporation place directs such voting to be by ballot. No single vote shall be split into fractional votes. Cumulative voting shall not be authorized.

**4.8    Action Without Meeting by Written Ballot**. Any action, which may be taken at any regular or special meeting of Members, may be taken without a meeting if the Corporation distributes a written ballot to every Member entitled to vote on the matter. Such ballot shall set forth the proposed action, provide an opportunity to specify approval or disapproval of any proposal, and provide a reasonable time within which to return the ballot to the Corporation. Approval by written ballot shall be valid only when the number of votes cast by ballot within the time period specified equals or exceeds a quorum of the Members, and the number of approvals equals or exceeds the number of votes that would be required to approve at a meeting at which the total number of votes cast was the same as the number of votes cast by ballot. Ballots shall be distributed to Members in accordance with delivery and timing requirements set forth in **Section 4.4**. All ballots distributed shall indicate the number of responses needed to meet the quorum requirement and shall state the percentage of approvals necessary to pass the measure sub-

mitted. All written ballots distributed shall specify the time by which the ballot must be received in order to be counted.

**4.9     Proxies.** Every Member entitled to vote shall have the right to do so in person or by one or more agents authorized by a written proxy executed by such person or his duly authorized agent and filed with the Secretary of the Corporation; but no such proxy shall be valid after the expiration of eleven (11) months from the date of its execution, unless the person executing it specifies therein the length of time for which such proxy is to continue in force.

**4.10     Conduct of Meetings.** Meetings of Members shall be presided over by the Chairman of the Corporation, or in his absence, by the Vice-Chairman, and in the absence of both of them, by the chair chosen by a majority of the Members present. The Secretary of the Corporation shall act as the secretary of all meetings of Members, provided that in his absence the presiding officer shall appoint another Member to act as acting secretary of the meeting.

## ARTICLE V
## BOARD OF DIRECTORS

**5.1     Powers.** Subject to the limitations of the Articles of Incorporation, the Bylaws, and the California Nonprofit Corporation Law and subject to the duties of Directors as prescribed by the Bylaws, all corporate powers shall be exercised by or under the authority of, and the business and affairs of this Corporation shall be controlled by, the Board of Directors. The Board of Directors shall have the power to select and remove all officers, agents, employees and contractors, and to fix reasonable compensation thereof, to authorize and empower officers or agents to enter into contracts and other commitments on behalf of this Corporation, and to appoint and delegate responsibilities and authority to committees, officers and agents.

**5.2     Number and Composition of Board of Directors.** The number of Directors shall be equal to the number of Promoter Members, and such number may be increased (but not decreased) by the Board of Directors. Each Promoter Member shall designate one (1) Director and one (1) Alternate Director (as more specifically defined in **Section 5.3**) to serve on the Board of Directors. Each Director and Alternate Director must be an employee, officer, director or duly authorized representative of the Promoter Member on behalf of which he or she is serving. Notwithstanding the foregoing, the Board of Directors may appoint and remove, from time to time, additional Board members when the Board of Directors believes that such appointment is in the best interests of the Corporation. The following events shall result in automatic termination of an individual's status as a Director: (a) termination of such Director's employment with or authority to represent the Promoter Member of which he/she was an employee or authorized representative; and/or (b) upon resolution by the Board of Directors terminating the Director for cause pursuant to **Section 5.19.2**. Any vacancy in the Board of Directors shall be filled pursuant to **Section 5.6**. Each of the Director and Alternate Director shall serve a one (1) year term unless otherwise provided under this **Section 5.2**. The provisions of this **Section 5.2** may not be amended except upon the two-thirds (2/3) written consent of the Board of Directors.

**5.3** **Alternate Directors**.  The following procedures shall apply to Alternate Directors:

**5.3.1** **Alternate Directors; Voting**.  Each Director shall have an alternate to serve in the capacity of Director in the event of the death, resignation, removal or absence of the Director; such alternate shall be referred to as an *"Alternate Director*." When serving in the capacity of Director, the Alternate Director shall have all the rights, privileges and responsibilities of the Director. Alternate Directors shall be entitled to attend all regular and special meetings of the Board of Directors and shall have all rights (including voting rights) of the Director in the absence of the Director.

**5.3.2** **Role of Alternate Director**.  In the event that the Alternate Director is serving as a Director due to the absence of the non-Alternate Director, such non-Alternate Director shall regain all of the rights, privileges and responsibilities of Director status upon the termination of his absence.  In the event that the Alternate Director is serving as a Director due to the death, resignation or removal of the Director, the Alternate Director shall immediately become a Director, and the corresponding position of Alternate Director shall become vacant.

**5.3.3** **Application of Bylaws**.  All provisions of these Bylaws apply equally to the Alternate Directors as to the Directors, unless otherwise noted.

**5.4** **Observers**.  In the event that neither the Director nor the Alternate Director is capable of serving due to absence or otherwise, the applicable Promoter Member shall have the right to appoint a non-voting observer to attend Board meetings.

**5.5** **Restrictions on Eligibility to Serve as a Director; Control Groups**.  No more than one (1) individual employed by or affiliated with an entity that constitutes a Control Group shall be permitted to serve as a Director or Alternate Director of the Corporation at one time. For purposes of this section, *"Control(s)," "Controlled"* or *"Controlling"* shall mean: (a) the ownership, directly or indirectly, of 50% or more of the total voting securities of another entity; or (b) in the case of unincorporated entities, shall mean the ownership of more than 50% of the ownership interest representing the right to make decisions for the entity. *"Control Group"* shall include a Member and all corporations or other entities which are Controlled by such Member or which Control such Member.

**5.6** **Vacancies**.  If there is a Director vacancy which is not filled by an Alternate Director pursuant to **Section 5.3** and/or upon the vacancy of an Alternate Director, the affected Promoter Member shall have sixty (60) calendar days from the date of notice of the vacancy from the Corporation to appoint a replacement Director and/or Alternate Director to the Board of Directors for the remaining term.  If the Promoter Member fails or refuses to make such appointment within such a sixty (60) calendar day period, the Board of Directors may fill any vacancy for the remaining term.  Any vacancies created by a failure of a Member to renew its membership may be filled by the Board of Directors.

**5.7     Place of Meeting**.  All meetings of the Board of Directors may be held at any place that has been designated from time to time by the Board of Directors or by the notice of the Chairman.

**5.8     Special Meetings**.  Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the Chairman, the Secretary or by any two (2) of the Directors.

**5.9     Notice of Meetings; Attendance**.  Notice of the time and place of each meeting of the Board of Directors not fixed by an express provision of the Bylaws or by a resolution of the Board of Directors shall be given to each Director not less than seventy-two (72) hours before the date of the meeting if given personally, by telephone or by electronic means including e-mail, and not less than four (4) days before the date of the meeting if given by first-class mail.

**5.10     Consent to Meetings**.  The transactions of the Board of Directors at any meeting however called and noticed or wherever held, shall be as valid as though done at a meeting duly held after call and notice if a quorum be present and if either before or after the meeting each Director not present: (a) signs a written waiver of notice; (b) signs a consent to the holding of such meeting; or (c) approves the minutes thereof.  Each Director who attends the meeting without protesting, prior thereto or at its commencement, shall be deemed conclusively to have consented to the holding of the meeting and to have waived the lack of notice to such Director.  All such waivers, consents or approvals shall be filed with the corporate records and made a part of the minutes of the meeting.

**5.11     Action Without Meeting**.  Any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all members of the Board of Directors shall individually or collectively consent in writing to such action.  Such written consent or consents shall be filed with the minutes of the proceedings of the Board of Directors.  Such action by written consent shall have the same force and effect as a unanimous vote of such Directors. Any certificate or other document filed under any provision of the California Nonprofit Corporation Law which relates to action so taken shall state that the action was taken by unanimous written consent of the Board of Directors without a meeting, and that the Bylaws authorize the Directors to so act.  For the purposes of this section only, "all members of the Board" shall not include any "*Interested Director*" as defined in **Section 5.18**.

**5.12     Telephonic Meetings**.  Directors may participate in a meeting through use of conference telephone or similar communications equipment, so long as all Directors participating in such meeting can hear one another.  Participation in a meeting through use of telephone or similar communications equipment shall constitute presence in person at such meeting.

**5.13     Quorum**.  A majority of the Directors then in office shall be necessary to constitute a quorum for the transaction of business, except to adjourn as hereinafter provided in **Section 5.14**.  Every act or decision done or made by a majority of the Directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Directors unless a greater number be required by law, the Articles of Incorporation or these Bylaws.

**5.14   Adjournment**. A majority of the Directors present, whether or not a quorum is present, may adjourn any Directors' meeting to meet again at another time or place. In the event a meeting of the Board of Directors is adjourned for more than forty-eight (48) hours, notice of any adjournment to another time or place shall be given prior to the time set for the rescheduled meeting to the Directors who were not present at the time of the adjournment.

**5.15   Fees and Compensation**. Directors shall serve without compensation, but by resolution of the Board of Directors, may be reimbursed for expenses paid while acting on behalf of the Corporation and/or expenses incurred in attending meetings of the Board of Directors. Nothing herein contained shall be construed to preclude any Director from serving the Corporation in any other capacity as an officer, agent, employee, or otherwise, and receiving compensation therefore so long as such compensation is approved by a majority of Directors, excluding any "*Interested Director*" as defined in **Section 5.18**.

**5.16   Indemnity for Litigation**. This Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any proceeding by reason of the fact that such person is or was a Director, Alternate Director, Officer, or member of any committee or working group of this Corporation, to the full extent allowed under the provisions of Section 7237 of the California Nonprofit Corporation Law relating to the power of a corporation to indemnify any such person. The amount of such indemnity shall be so much as the Board of Directors determines and finds to be reasonable, or, if required by said Section 7237 of the California Nonprofit Corporation Law, the amount of such indemnity shall be so much as the court determines and finds to be reasonable.

**5.17   Standard of Conduct**. Pursuant to Section 7231 of the California Nonprofit Corporation Law, a Director (and Alternate Director, as applicable) shall perform the duties of a Director, including duties as a member of any committee or working group upon which the Director may serve, in good faith, in a manner such Director believes to be in the best interests of this Corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. In performing the duties of a Director, a Director or Alternate Director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by:

     (a)   One or more officers or employees of this Corporation whom the Director believes to be reliable and competent in the matters presented;

     (b)   Legal counsel, independent accountants or other professionals as to matters which the Director believes to be within such person's professional or expert competence; or

     (c)   A committee of the Board upon which the Director does not serve, as to matters within the committee's designated authority, which committee the Director believes to merit confidence; provided that, in any such case, the Direc-

tor acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

**5.18    Self-Dealing Transactions**.  As used in this section, a "self-dealing contract" is any contract or transaction: (a) between this Corporation and one or more of its Directors, or between this Corporation and any corporation, firm or association in which one or more of the Directors has a material financial interest; or (b) between this Corporation and a corporation, firm or association of which one or more of its directors are Directors of this Corporation (collectively, "*Interested Director(s)*").  Pursuant to Section 7233 of the California Nonprofit Corporation Law, no self-dealing contract shall be void or voidable because such Interested Director(s) or corporation, firm or association are parties or because such Interested Director(s) are present at the meeting of the Board or committee which authorizes, approves or ratifies the self-dealing contract, if:

> **5.18.1 Membership Approval**.  All material facts are fully disclosed to or otherwise known by the Members and the self-dealing contract is approved by the Members in good faith including the abstention from voting by any membership owned by such Interested Director(s);

> **5.18.2 Board or Committee Approval**.  All material facts are fully disclosed to or otherwise known by the Board or committee and the Board or committee authorizes, approves, or ratifies the self-dealing contract in good faith (including the abstention from voting by the Interested Director(s)), and, in the case of a self-dealing contract described above, the Board or committee resolves and finds that the contract is just and reasonable at the time it is authorized, approved or ratified; or

> **5.18.3 Just and Reasonable Contract**.  The person asserting the validity of the self-dealing contract sustains the burden of proving that the contract was just and reasonable as to the Corporation at the time it was authorized, approved or ratified.

Interested Director(s) may be counted in determining the presence of a quorum at a meeting of the Board or a committee thereof which authorizes, approves or ratifies a contract or transaction as provided in this **Section 5.18**.

**5.19    Resignation and Removal**.

> **5.19.1 Resignation**.  Any Director or Alternate Director may resign at any time by giving written notice to the Board of Directors, to the Chairman or to the Secretary of this Corporation.

> **5.19.2 Removal**.  Any Director and/or Alternate Director may be removed upon resolution by the Board of Directors terminating such individual's status as such a Direc-

tor for any of the following, all of which constitute removal for cause: (a) four (4) or more unexcused absences from Board of Directors meetings during any year; (b) conviction or entry of a plea of nolo contendere by such Director for a crime; (c) intentional breach of fiduciary duties by such Director; (d) public disparagement or ridicule of the Corporation by such Director; or (e) gross mismanagement or waste by such Director. Upon termination of an individual's status as a Director or Alternate Director or if there is otherwise a vacancy on the Board of Directors, the vacancy may be filled pursuant to **Section 5.6**.

**5.20    Advisory Board**.  The Board of Directors may, at its sole discretion, appoint a board of advisors ("*Advisory Board*") with which the Board of Directors shall consult on matters relating to the operation of the Corporation.  The members of the Advisory Board shall not have the rights or privileges of Directors or Members as set forth in Sections 5047 and 5056 of the California Nonprofit Corporation Law and shall have no power or authority over the operation of the Corporation.  The Advisory Board may be restructured and/or terminated by resolution of the Board of Directors at any time.  A member of the Advisory Board may be removed at any time by the Board of Directors in its sole and absolute discretion.

# ARTICLE VI
# OFFICERS

**6.1    Officers**.  The principal officers of this Corporation shall be a Chairman, Vice Chairman, Chief Financial Officer or Treasurer, and Secretary and such other officers as the Board of Directors may appoint.  One person may hold two or more offices.  Officers of the Corporation may be any person nominated by a Director and nothing herein shall require such individual to be a Director or an employee or duly authorized representative of any Member of the Corporation.

**6.2    Election**.  The officers of this Corporation shall be appointed by the Board of Directors in accordance with this **Article 6**, and each officer shall hold his or her office for a term of one (1) year, or until he or she shall resign or shall be removed or his or her successor shall be elected and qualified.

**6.3    Removal and Resignation**.

**6.3.1    Removal**.  Any officer may be removed at any time, either with or without cause, by the Board of Directors or by any officer upon whom such power of removal may be conferred by the Board of Directors.

**6.3.2    Resignation**.  Any officer may resign at any time by giving written notice to the Board of Directors or the Secretary of the Corporation.  Any such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein, and, unless otherwise specified therein, the acceptance of such resignation shall not be

necessary to make it effective. Such resignation shall not prejudice the rights of the Corporation under any contract to which the officer is a party.

**6.4    Vacancies**. A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled by the Board of Directors for the unexpired term.

**6.5    Chairman**. The Chairman shall serve as the Chief Executive Officer of this Corporation. Subject to the control of the Board of Directors, the Chairman shall have general supervision, direction and control of the business and affairs of this Corporation. The Chairman shall serve as an *ex officio* voting member of all committees, and shall have such other powers and duties as may be designated from time to time by the Board of Directors. The Chairman shall be a member of the Board of Directors and preside at all meetings of the Board of Directors.

**6.6    Vice Chairman**. In the absence of the Chairman, or in the event of his or her inability or refusal to act, the Vice Chairman shall perform all the duties of the Chairman, and when so acting shall have all the powers of, and be subject to all the restrictions on, the Chairman. The Vice Chairman shall have such other powers and duties as may be designated from time to time by the Board of Directors or the Chairman. There shall be no limit on the number of Vice Chairmen that may be appointed by the Board of Directors.

**6.7    Chief Financial Officer/Treasurer**. The Chief Financial Officer/Treasurer shall oversee the financial and accounting matters of this Corporation with respect to the receipt and deposit of funds. The Chief Financial Officer/Treasurer shall have such other powers and duties as may be designated from time to time by the Board of Directors.

**6.8    Secretary**. The Secretary shall keep a full and complete record of the proceedings of the Board of Directors, shall keep the seal (if one is maintained) of this Corporation and affix it to such papers and instruments as may be required in the regular course of business, shall make service of such notices as may be necessary or proper, and shall supervise the keeping of the records of this Corporation. The Secretary shall have such other powers and duties as may be designated from time to time by the Board of Directors.

# ARTICLE VII
## COMMITTEES AND WORKING GROUPS

**7.1    Appointment of Committees**. The Board of Directors may create committees as the Board from time to time deems necessary or appropriate to conduct the business and further the objectives of this Corporation. Such committees shall have the responsibilities and duties established by the Board of Directors. Any such committees may be restructured and/or terminated by the Board of Directors at any time.

**7.2    Powers and Authority of Committees**. Without limiting the generality of **Section 7.1**, the Board of Directors may delegate to any committee any of the powers and authority

of the Board of Directors in the management of the business and affairs of this Corporation, except the following:

      (a)    The approval of any action for which the California Nonprofit Corporation Law also requires the approval of Members of a corporation;

      (b)    The filling of vacancies on the Board or in any committee that has the authority of the Board;

      (c)    The fixing of compensation of the Directors for serving on the Board or on any committee;

      (d)    The amendment or repeal of Bylaws or the adoption of new Bylaws;

      (e)    The amendment or repeal of any resolution of the Board, which by its express terms is not so amendable or repealable;

      (f)    The appointment of committees of the Board or the members thereof; and

      (g)    The expenditure of corporate funds to support a nominee for Director after there are more people nominated for Director than can be elected.

**7.3    Technical Steering Committee.** Without limiting the generality of the **Sections 7.1** and **7.2**, the Board of Directors may create a technical steering committee ("**TSC**"). The TSC shall report directly to the Board of Directors. TSC responsibilities will include: (a) propose, evaluate, develop and approve technical specifications of the Working Groups; (b) review and recommend proposed specifications and deliverables to the Board of Directors for publication and/or endorsement by the Corporation; and (c) such other responsibilities or duties as may be established by the Board of Directors. The TSC may be restructured and/or terminated by resolution of the Board of Directors at any time. The TSC shall be chaired by an individual appointed by the Board of Directors and shall be comprised of a duly authorized representative of each Working Group. The Chair of the TSC may be any person nominated by a Director and nothing herein shall require such individual to be Director or an employee or duly authorized representative of any Member of the Corporation.

**7.4    Working Groups.** Working groups may be formed, restructured and/or terminated at any time by resolution of the Board of Directors for the purpose of, among other things, developing, analyzing and writing technical specifications and deliverables ("**Working Group**"). Each Working Group shall report directly to the TSC. Members may appoint any number of its employees or duly authorized representatives to a Working Group.

**7.5    Compensation.** Any individuals appointed to the TSC, any committee and/or any Working Group of the Corporation shall not receive compensation for their services as such,

but, upon prior approval of each expenditure by the Board of Directors, may be reimbursed for bona fide expenses incurred arising out of conducting business on behalf of the Corporation. Nothing herein shall prohibit payment of compensation to an individual serving on the TSC, any committee or Working Group who renders services to the Corporation in another capacity.

# ARTICLE VIII
## IPR POLICY AND APPROVAL OF SPECIFICATIONS

    **8.1**    **General.** The terms and conditions relating to the intellectual property rights of Members ("*IPR Policy*") are set forth in the Promoter Member Agreement and the Participation Agreement.

    **8.2**    **Modifications to the IPR Policy.** The IPR Policy may be modified from time to time in accordance with the procedures below:

        (a)    The Board of Directors may, upon a two-thirds (2/3) affirmative vote, modify the IPR Policy if such modifications do not adversely affect a Promoter Member's or Participant's obligations, rights and protections under the current IPR Policy.

        (b)    If any proposed modifications adversely affect a Promoter Member's or Participant's obligations, rights or protections, such proposed modifications shall be submitted to the Promoter Members for approval, and a two-thirds (2/3) affirmative vote of the Promoter Members shall be required for such modifications to become effective.

    **8.3**    **Application of Modified IPR Policy.** The modified IPR Policy will apply to all Promoter Members and/or Participants of the Corporation prospectively in lieu of the previous IPR Policy, from the date the modified IPR Policy is approved pursuant to **Section 8.2**, provided that:

        (a)    prior to adoption of such modifications, the Promoter Members and Participants are provided with a thirty (30) calendar day review and comment period with respect to the proposed modifications;

        (b)    each Promoter Member and Participant shall have the right to withdraw from the Corporation pursuant to the terms and conditions of the Promoter Member Agreement or the Participation Agreement, as applicable, within thirty (30) calendar days after approval of the modifications; and

        (c)    the Promoter Members and Participants shall be provided written notice (pursuant to the notice provisions of the Promoter Member Agreement or Participation Agreement, as applicable) of the foregoing time periods and their ability to withdraw.

**8.4    Approval of Specifications**.  Proposed Specifications (as defined in the IPR Policy) submitted to the Board of Directors for adoption shall require a two-thirds ($^2/_3$) vote for approval, and upon such approval shall become "Adopted Specifications."

# ARTICLE IX
## MISCELLANEOUS

**9.1    Fiscal Year**.  The fiscal year of this Corporation shall end on the last day of December of each year.

**9.2    Inspection of Corporate Records**.  The books of account and minutes of the proceedings of the Board of Directors, and of any committees of the Board of Directors, shall be open to inspection at the principal office of this Corporation by each Promoter Member at any reasonable time upon the written demand of any Promoter Member.  Such inspection may be made in person or by an agent or attorney, and shall include the right to make photocopies and extracts at the requesting Promoter Member's expense.

**9.3    Representation of Shares of Other Corporations**.  Any officer of this Corporation is authorized to vote, represent and exercise on behalf of this Corporation all rights incident to any and all shares of any other corporation or corporations standing in the name of this Corporation.  The authority herein granted to said officers may be exercised by such officers in person or by other persons authorized to do so by proxy duly executed by such officers.

**9.4    Checks, Drafts, Etc**.  All checks, drafts or other orders for payment of money, notes or other evidences of indebtedness issued in the name of or payable to this Corporation and any and all securities owned by or held by this Corporation requiring signature for transfer shall be signed or endorsed by such person or persons and in such manner as from time to time shall be determined by the Board of Directors.

**9.5    Execution of Contracts**.  The Board of Directors may authorize any officer, employee, or agent to enter into any contract or execute any contract or execute any instrument in the name of and on behalf of this Corporation and such authority may be general or confirmed to specific instances.  Unless so authorized by the Board of Directors, no officer, agent, or employee shall have any power or authority to bind this Corporation by any contract or engagement or to pledge its credit or to render it liable for any purpose or in any amount.

**9.6    Corporate Loans, Guarantees and Advances**.  This Corporation shall not make any advances or make any loan of money or property to or guarantee the obligation of any Director or Officer.

**9.7    Inspection and Disclosure**.  The Corporation shall keep or cause to be kept correct and complete books and records of account and shall also keep minutes of the proceedings of the Board of Directors or other documents as may be required by law on its own behalf.  The

Corporation shall have available for inspection at its principal office a copy of its three (3) most recent annual exempt organization information returns and a copy of its application for recognition of exemption and determination letter.

    **9.8**    **Not For Profit Status**.  Neither the Corporation nor any of its Members shall individually or collectively, directly or indirectly, engage in any act that will result in the loss of, or otherwise adversely affect, its status as a tax-exempt organization under the United States Internal Revenue Code.

    **9.9**    **Forms of Notice**.  Any notice or writing required or permitted under these Bylaws may be given in writing, in person, by mail, by private carrier or by telephone, electronic transmission (including facsimile and e-mail) or other form of wire or wireless communication.

    **9.10**    **Severability**.  The invalidity of any clause, provision, or Article of these Bylaws shall not affect the validity or enforceability of the remaining clauses, provisions or Articles.

## ARTICLE X
## EFFECTIVE DATE AND AMENDMENT

    **10.1**    **Effective Date**.  These Bylaws shall become effective immediately upon their adoption.  Amendments to these Bylaws shall become effective immediately upon their adoption unless the Board of Directors of this Corporation in adopting them provide that they are to become effective at a later date.

    **10.2**    **Amendments**. These Bylaws may be amended by an affirmative vote of a majority of the Board of Directors then in office, unless: (a) the specific provision(s) of these Bylaws being amended sets forth a greater number of affirmative votes for an action, in which case any amendments to such provision(s) shall require the greater number of affirmative votes set forth in such provision(s); and/or (b) such an amendment requires an affirmative vote of a majority of the Promoter Members as provided by Section 7150 of the California Nonprofit Corporation Law.

Adopted:      November 19, 2002

# Exhibit F

# ZIGBEE ALLIANCE

# PARTICIPATION AGREEMENT

**Parties:**

ZigBee Alliance

("*ZigBee*" or "*Alliance*")

c/o Global Inventures

2400 Camino Ramon
Suite 375
San Ramon, CA  94583

Attn:  Bill Chase

_____
Corporate Name ("*Participant*")

_____
Address

_____
City, State, Zip Code

_____
Contact Name

_____
E-Mail Address

_____
Phone

This Participation Agreement ("*Participation Agreement*") is made as of the date accepted by ZigBee as set forth below.  By executing this Participation Agreement, Participant agrees to be bound by the terms and conditions attached to this cover page.

**ZigBee Alliance**

_____, Chairperson/President
Date Accepted:  _____

**Participant**

By:   _____
Its:  _____
Date:  _____

# PARTICIPATION AGREEMENT

# TERMS AND CONDITIONS

## 1.    Incorporation

The Alliance is organized as a nonprofit corporation under the laws of the State of California. The Articles of Incorporation and initial form of Corporate Bylaws of the Alliance are set forth in **Exhibit 1** (*"Corporate Documents"*). By executing this Participation Agreement, Participant consents to the form of the Corporate Documents. Participant acknowledges that the Corporate Documents may be amended from time to time in accordance with the provisions of the Corporate Documents and as may be allowed by law. The Alliance intends to or has filed for tax exempt status under Section 501(c)(6) of the Internal Revenue Code of 1986, as amended, and Participant agrees not to engage in activities for or on behalf of the Alliance that may adversely affect the nonprofit or tax-exempt status of the Alliance.

## 2.    Purposes of Alliance

The Alliance is a non-profit mutual benefit corporation formed to promote the use of two-way wireless communications standards for consumer electronics, home and building automation, industrial controls, PC peripherals, medical sensor applications, toys and other related applications.

The purposes for which the Alliance is organized are to:

(a)    Bring about the existence of a broad range of interoperable consumer and industrial devices by promoting open industry Specifications for unlicensed, untethered peripheral, control and entertainment devices;

(b)    Provide a forum and environment whereby the Promoter Members and Participants of the Alliance may meet to approve suggested revisions and enhancements to Specifications; make appropriate submissions to established agencies and bodies with the purpose of ratifying Specifications as an international standard; and provide a forum whereby users may meet with developers and providers of related products and services to identify requirements for interoperability and general usability;

(c)    Educate the business and consumer communities as to the value, benefits and applications for wireless consumer products and services through public statements, publications, trade shows demonstrations, seminar sponsorships and other programs established by the Alliance;

(d)    Protect the needs of consumers and increase competition among vendors by supporting the creation and implementation of uniform, industry-standard confor-

mance test procedures and processes which assure the interoperability of wireless consumer products and services;

(e)     Maintain relationships and liaison with educational institutions, government re-search institutes, other technology consortia, and other organizations that support and contribute to the development of the Specifications and standards; and

(f)     Foster competition in the development of new products and services based on Specifications developed and/or adopted by the Alliance in conformance with all applicable antitrust laws and regulations.

The Alliance and its Participants and Promoter Members shall individually and collec-tively be committed to open competition in the development of products, technology and ser-vices, and Participants and Promoter Members shall not be restricted in any way from designing, developing, marketing and/or procuring hardware, software, systems, technology or services. Implementation or use of specific Adopted Specifications is voluntary. No Participant and/or Promoter Member shall be required or obliged to implement Adopted Specifications by virtue of being a Participant and/or Promoter Member, as applicable, of the Alliance.

## 3.     Participation as a Participant; Dues

Subject to the terms of **Section 9**, upon acceptance of this Participation Agreement by the Alliance and payment of the appropriate dues, Participant shall hold the status of a Participant of the Alliance for a period of twelve (12) months commencing on the acceptance date. Subject to the terms of **Section 9**, Participant may renew its Participant status for subsequent twelve (12) month periods by paying any then-current annual dues established by the Board of Directors. Failure to pay annual or specially assessed dues when due shall result in termination and/or non-renewal of Participant's status pursuant to **Section 9(d)**. dues are non-refundable, except in the case of a distribution upon the event of a dissolution as set forth in the Corporate Bylaws. The Board of Directors may increase or decrease the annual dues required of Participants in accor-dance with the Corporate Bylaws. All dues shall be used in furtherance of the purposes of the Alliance. Subject to the survival provisions of **Section 9(e)**, upon expiration or termination of the Participant's status as a Participant of the Alliance, all rights and privileges provided and/or granted to Participant and/or any Affiliate of Participant pursuant to **Section 4** of this Participa-tion Agreement and/or pursuant to any policies and procedures of the Alliance shall terminate.

## 4.     Duties and Rights of Participants

The duties, rights, privileges and obligations of Participants shall be determined by the Board of Directors from time to time. Unless otherwise determined by the Board of Directors, Participant shall not be entitled to any voting rights with respect to the business or proceedings of the Alliance.

The designated contact and representative of Participant is identified by Participant on the first page of this Participation Agreement. The designated representative of Participant may be changed by Participant from time to time upon prior written notice to the Alliance.

If Participant is a consortium, association or other similar organization or otherwise has members or sponsors, the rights and privileges granted to Participant as a Participant shall extend only to Participant, and not to Participant's members or sponsors.

## 5.    Intellectual Property Rights

Participant agrees to the terms and conditions of the Intellectual Property Rights ("*IPR*") Policy attached hereto as **Exhibit 2**. Participant acknowledges and understands that the IPR Policy may be revised from time to time in accordance with the provisions of the Corporate Bylaws.

## 6.    Confidential Information

Except as otherwise identified by Participant, any information Participant submits or discloses to the Alliance, including any committee or working group thereof, shall be treated as non-confidential and shall be available to all Participants and Promoter Members of the Alliance without restriction. Any information pertaining to the business of the Alliance which Participant submits or discloses to the Alliance, including any committee or working group thereof, and which is:  (a) marked by Participant as '*Confidential*" information, or (b) if orally disclosed, identified as Confidential prior to disclosure and reduced to writing and marked as Confidential within three (3) business days from the date of disclosure, shall be treated as Confidential information with respect to third parties, except for any portion thereof that constitutes information: (c) rightfully in the public domain other than by a breach of a duty to the disclosing party; (d) rightfully received from a third party without any obligation of confidentiality; (e) rightfully known to the receiving party without any limitation on use or disclosure prior to its receipt from the disclosing party; (f) independently developed by employees of the receiving party; or (g) generally made available to third parties by the disclosing party without restriction or disclosure. Such Participant Confidential information shall be maintained by each Participant and Promoter Member of the Alliance in confidence with at least the same degree of care that it uses to protect its own proprietary information and in no event with less than reasonable care, and each Participant and Promoter Member of the Alliance that receives such Participant Confidential information shall only use such Confidential information for the Alliance purpose for which it was submitted. In the event a Participant and/or Promoter Member of the Alliance breaches the obligation of confidentiality with respect to Confidential information of Participant, the sole and exclusive remedy of Participant shall be to seek recourse against the breaching Participant and/or Promoter Member of the Alliance and the Alliance shall have no liability with respect to such breach. Third parties seeking access to Participant's Confidential information that has been provided to the Alliance must reach an agreement with Participant as condition for being provided the Participant's Confidential information. Participant Confidential information will not be included in an Alliance Adopted Specifications unless Participant waives its confidentiality. The rights and obligations set forth in this **Section 6** shall expire three (3) years after the date the Participant discloses or submits the Participant Confidential information to the Alliance or to any other Participant or Promoter Member of the Alliance.

7.    **Prohibited Activities**

Participant agrees to the terms and conditions of the Antitrust Guidelines attached hereto as **Exhibit 3**.

8.    **Application to Affiliates**

(a)    **Definition**

"*Affiliate*" shall mean, with respect to Participant, any entity controlling, controlled by or under common control with Participant, where "control" means direct or indirect ownership of or the right to exercise: (i) greater than fifty percent (50%) of the outstanding shares or securities entitled to vote for the election of directors or similar managing authority of the subject entity; or (ii) greater than fifty percent (50%) of the ownership interest representing the right to make decisions for the subject entity. Notwithstanding the foregoing, Affiliate shall not mean any entity that has previously been or which is currently a Participant or Promoter Member of the Alliance.

(b)    **Rights of Affiliate**

As of the effective date of this Participation Agreement and subject to all the terms of this Participation Agreement, including without limitation, this **subsection (b)** and **subsection (c)** below, Affiliates of Participant shall have the right to exercise the rights and benefit from the licenses granted to Participant hereunder, provided that such Affiliates acknowledge and agree to be bound by: (i) all terms and conditions set forth in **Sections 5** through **22** of this Participation Agreement; and (ii) any policies and procedures applicable to Participants and/or Affiliates of Participant as may be determined by the Board of Directors from time to time. For purposes of the foregoing Sections of this Participation Agreement, all references to "Participant" shall be deemed to also include such Affiliates of Participant. The rights granted under this **Section 8** shall terminate immediately upon: (iii) the Affiliate's material breach of any of its obligations under this **Section 8**; or (iv) termination or expiration of this Participation Agreement pursuant to **Section 9**.

(c)    **Right to Bind**

An Affiliate of Participant shall not have the right to exercise the rights granted to Participant hereunder until the Board of Directors, or at the direction of the Board of Directors, an officer of the Alliance reviews and approves of such Affiliate's participation in the Alliance through this Participation Agreement. As a condition of such approval, the Board of Directors, or at the direction of the Board of Directors, an officer of the Alliance, may require written documentation that such Affiliate has duly authorized Participant and/or Participant has the corporate authority to bind such Affiliate. The Board of Directors, or at the direction of the Board of Directors, an officer of the Alliance, may require additional proof of the relationship between Participant and such Affiliate and/or may impose additional conditions or terms governing such Affiliate's participation in the

Alliance through this Participation Agreement at any time, including, without limitation, prior to any access and/or use of any intellectual property or Confidential information by Participant and/or any Affiliate under the terms of this Participation Agreement.

## 9.    Term and Termination

### (a)    Term

Participant acknowledges that the Alliance shall have a perpetual corporate term. This Participation Agreement shall commence on the acceptance date and remain in effect until the earlier of:  (i) expiration of the Alliance's corporate term; (ii) such time as Participant elects not to renew its Participant status as provided in **Section 3**; (iii) such time as Participant elects to voluntarily withdraw as a Participant of the Alliance as provided in **Section 9(b)**; and (iv) termination of Participant's status as a Participant as provided in **Section 9(c)**.

### (b)    Voluntary Withdrawal as Participant

Upon written notice to the Alliance, Participant shall have the right to withdraw as a Participant of the Alliance.  Upon such withdrawal, Participant shall have no right to receive a refund of any previously paid dues, and the terms of **Section 9(e)** shall apply.

### (c)    Termination of Participation

Upon the affirmative vote of not less than two-thirds (2/3) of the Board of Directors, the Alliance shall have the right to terminate Participant's status as a Participant of the Alliance for cause.  The term "for cause" shall mean Participant's failure to materially comply with its obligations under this Participation Agreement.  Upon such termination, Participant shall have no right to receive a refund of any previously paid dues and the terms of **Section 9(e)** shall apply.

### (d)    Failure to Pay Annual or Specially Assessed Dues

Participant acknowledges that Participant status is conferred on an annual basis and that any renewal of participation, or in the case of a special assessment, continuation of participation, is contingent upon payment of the applicable dues.  If Participant fails to pay the applicable annual or special assessment dues when required:  (i) Participant's status in the Alliance will not be renewed in the case of failure to pay the annual dues or will be terminated in the case of failure to pay the specially assessed dues; (ii) Participant shall be entitled to continue participation only upon re-application to the Alliance; (iii) Participant waives any notice or process requirements in connection with such non-renewal and/or termination of participation status; and (iv) the terms of **Section 9(e)** shall apply.

### (e)    Survival

Upon expiration or termination of a Participant's status as a Participant of the Alliance: (i) the following terms shall survive: (A) this **Section 9(e)** and **Sections 6, 11 and 12** of this Participation Agreement; and (B) Sections 2 and 3 the IPR Policy with respect to Necessary Claims of the Participant and of other Promoter Members and/or Participants incorporated into or a part of any Adopted Specifications existing prior to the effective date of expiration or termination of such Participant's status as a Participant; and (ii) the terms Sections 2 and 3 of the IPR Policy shall not apply to any portions of Proposed Specifications which have been expressly identified and affirmatively withdrawn from the Proposed Specifications by such Participant prior to the effective date of expiration or termination of such Participant's status as a Participant.

## 10.  Disclaimer of Warranties

**NEITHER PARTY HERETO MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY SOFTWARE, DOCUMENTATION, INTERFACES, SAMPLE IMPLEMENTATIONS, SPECIFICATIONS OR ANY OTHER ITEMS PROVIDED OR MADE AVAILABLE TO PARTICIPANT, THE ALLIANCE OR ANY OTHER PARTICIPANTS AND PROMOTER MEMBERS OF THE ALLIANCE, OR WITH RESPECT TO ANY STANDARD OR INTERFACE OR SPECIFICATIONS APPROVED, PROMOTED OR ENDORSED BY THE ALLIANCE OR ANY OTHER PARTICIPANTS AND PROMOTER MEMBERS OF THE ALLIANCE, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR THAT ANY OF THE FOREGOING ITEMS DO NOT INFRINGE OR CONSTITUTE A MIS-APPROPRIATION OF THE PROPRIETARY RIGHTS OF ANY THIRD PARTIES. EACH PARTY AGREES THAT ALL SUCH ITEMS ARE PROVIDED OR MADE AVAILABLE HEREUNDER "AS IS."**

## 11.  Limitation of Liability

Except for the indemnity obligations under **Section 12** below, neither party shall be liable to the other for any indirect, special, exemplary, consequential, special or punitive damages, including without limitation, lost profits even if advised of the possibility of such damages. In addition to the foregoing, with respect to Participant's participation in the Alliance, the Alliance shall not be liable to Participant for any direct, indirect, incidental, consequential, special or punitive damages including, without limitation, lost profits, sustained or incurred by Participant which are not attributable to the actions or inactions of the Alliance under this Participation Agreement.

## 12.  Indemnification

Participant shall indemnify, defend and hold harmless the Alliance and its directors, officers, employees, representatives, agents, attorneys, successors and assigns (collectively, the "*Indemnified Parties*") from and against any and all claims, suits, proceedings, liabilities, obligations, judgments, causes of action, costs and expenses (including reasonable attorneys' fees) to the extent arising out of or resulting from Participant's failure to materially comply with any of

its obligations under this Participation Agreement. The Indemnified Parties promptly shall notify Participant of any such claims, suits or proceedings and, at Participant's sole cost and expense, reasonably cooperate with Participant in the defense of such claims, suits or proceedings. Participant's cumulative liability pursuant to this **Section 12** shall not exceed One Hundred Thousand Dollars ($100,000).

## 13.   Insurance

The Alliance may purchase and maintain insurance on behalf of any person who is or was a director, committee member, officer, employee or working group member of the Alliance covering the activities of such persons related to the business of the Alliance.

## 14.   Notices

Any written notice required or permitted to be delivered pursuant to this Participation Agreement shall be in writing and shall be deemed delivered:  (a) upon delivery if delivered in person; (b) three (3) business days after deposit in the United States mail, registered or certified mail, return receipt requested, postage prepaid; (c) upon transmission if sent via telecopier, with a confirmation copy sent via overnight mail, provided that such overnight delivery is received by the sender; and/or (d) one (1) business day after deposit with a national overnight courier, provided that such overnight delivery is received by the sender, in each case addressed to the following:

If to Participant:

The Contact/Representative at the address
identified on the cover page of this
Participation Agreement

If to the Alliance:

ZigBee Alliance
c/o Global Inventures
2400 Camino Ramon, Suite 375
San Ramon, CA 94583
Attention:  Bill Chase
Telecopier:  (925) 275-6691

or to such other individual or address as may be specified by either party hereto upon notice given to the other.

## 15.   Binding Nature and Assignment; Transfer of Participation Interest

This Participation Agreement shall be binding on the parties and their successors and assigns.  Participant shall not assign or otherwise transfer its participation interest nor this Partici-

pation Agreement, or any part hereof, whether by operation of law, change of control (including a merger, exchange of stock or otherwise) or otherwise, without the prior written consent of the Alliance. Any assignment or transfer or attempted assignment or transfer by Participant in violation of the terms of this Section shall be null and void and of no force or effect.

## 16.    Media Releases and Use of Trademarks and Logos

Alliance agrees that Participant shall have the right to list the Alliance's name and logo on Participant's web site and advertising and promotion materials in accordance with guidelines to be adopted by the Alliance. Except as provided above or as may be allowed pursuant to written instructions or guidelines issued by a party, neither party shall use the name or any trademark or logo of the other party without such other party's prior consent. By executing this Participation Agreement, Participant agrees that the Alliance shall have the right to list Participant's name and logo on the Alliance web site and advertising and promotion materials, in accordance with written instructions and limitations provided to the Alliance by Participant.

## 17.    Counterparts

This Participation Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument.

## 18.    Severability

If any provision of this Participation Agreement is found by a court of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable any other part of this Participation Agreement, but this Participation Agreement shall be construed as not containing the particular provision or provisions held to be invalid or unenforceable.

## 19.    Waiver

No delay or omission by either party to exercise any right occurring upon any noncompliance or default by the other party with respect to any of the terms of this Participation Agreement shall impair any such right or power or be construed to be a waiver thereof. A waiver by either of the parties hereto of any of the covenants, conditions or agreements to be performed by the other shall not be construed to be a waiver of any succeeding breach thereof or of any covenant, condition or agreement herein contained.

## 20.    Governing Law

This Participation Agreement, and all the rights and duties of the parties arising from or relating in any way to the subject matter of this Participation Agreement or the transaction(s) contemplated by it, shall be governed by, construed and enforced in accordance with the laws of the State of California (excluding any conflict of laws provisions of the State of California that would refer to and apply the substantive laws of another jurisdiction).

## 21.     Relationship of Parties

Nothing set forth in this Participation Agreement shall be deemed or construed to render the parties as joint venturers, partners or employer and employee.

## 22.     Entire Agreement; Modifications

This Participation Agreement, together with the Corporate Documents, sets forth the entire, final and exclusive agreement between the parties as to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, between the parties. This Participation Agreement may be modified only pursuant to a writing executed by authorized representatives of the Alliance and Participant.

# EXHIBIT 1

# ARTICLES OF INCORPORATION
# AND CORPORATE BYLAWS

# (SEE ATTACHED)

# ARTICLES OF INCORPORATION

## OF

## ZigBee Alliance

### I.

The name of this corporation is ZigBee Alliance.

### II.

A. This corporation is a nonprofit mutual benefit corporation organized under the Nonprofit Mutual Benefit Corporation Law. The purpose of this corporation is to engage in any lawful act or activity for which a corporation may be organized under such law.

B. The Corporation's main purpose is to bring about the existence of a broad range of interoperable consumer devices by establishing open industry specifications for unlicensed, untethered peripheral, control and entertainment devices anywhere in and around the home. The Corporation's efforts may include, but are not limited to developing and adopting open software, establishing interoperability and certification programs, and improving market conditions through user education, training and other support programs.

### III.

The name in the State of California of this corporation's initial agent for service of process is:

Deepak Kamlani, CEO & Founder, Global Inventures
c/o ZigBee Alliance
2694 Bishop Dr., Suite 275
San Ramon, CA, USA 94583

### IV.

Notwithstanding any of the above statements of purposes and powers, this corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the specific purposes of this corporation.

_Deepak Kamlani_

Deepak Kamlani, Incorporator

ZigBee Articles-Final

EXHIBIT 2-A

# ZIGBEE ALLIANCE

## INTELLECTUAL PROPERTY RIGHTS POLICY

### (Governing ZigBee Version 1.0 Adopted Specifications)

The IPR of the Alliance and its Promoter Members, Participants and Adopters for Version 1.0 Adopted Specifications shall be governed by the policy set forth herein (*"IPR Policy"*). The IPR of the Alliance and its Promoter Members, Participants and Adopters for Subsequent Adopted Specifications shall be governed by the Intellectual Property Rights Policy for Subsequent Adopted Specifications. Recognizing that the Alliance is an open participation organization whose activities are focused on encouraging the rapid advancement of interface Specifications for consumer electronics, home and building automation, industrial controls, PC peripherals, medical sensor applications, toys and other related applications, this IPR Policy is designed to maximize widespread adoption of Specifications. In furtherance of the objective of widespread adoption, the Alliance and its Promoter Members, Participants and Adopters agree that barriers to industry use of Adopted Specifications should be limited as much as possible. Capitalized terms used in this Exhibit are defined in **Section 8** of this Exhibit or the Promoter Member Agreement.

1.  **IPR Categories**. IPR shall be categorized as follows:

    **(a)** Adopted Specifications;
    **(b)** Alliance IPR; and
    **(c)** Joint IPR

with each category subject to the further terms set forth in this IPR Policy.

2.  **Disclosure of Necessary Claims**. In the course of evaluating Proposed Specifications for adoption by the Alliance, each Promoter Member, Participant and Adopter shall have a ninety (90) calendar day period or such longer period as may be required by law ("*Disclosure Period*") after the Board of Directors recommends the adoption of any Proposed Specifications to disclose whether such Promoter Member, Participant or Adopter has or is aware of any Necessary Claims (including without limitation, any Necessary Claims of an Affiliate of a Promoter Member, Participant, Adopter and/or a Non-Member) relating to the applicable Proposed Specifications which a Promoter Member, Participant, Adopter, Affiliate or Non-Member expects to license to the Alliance and/or Promoter Members, Participants and Adopters on a fee-based arrangement. To the extent a Promoter Member, Participant or Adopter determines that its Affiliate may possess or have rights to any Necessary Claims in the Proposed Specifications which are intended to

be disclosed under this **Section 2**, such Promoter Member, Participant or Adopter shall disclose the nature, extent and scope of such Necessary Claims and, if required, shall cause such Affiliate to join the Alliance as an Affiliate under Section 9 of the Agreement or other arrangement between the Alliance and such Affiliate. Failure of a Promoter Member, Participant or Adopter to identify and/or disclose any Necessary Claims in accordance with the terms of this **Section 2** will result in and be reported as the Promoter Member, Participant or Adopter having granted a Royalty Free License to any Necessary Claims of such Promoter Member, Participant, Adopter and/or Affiliate, as applicable. The Alliance shall develop a declaration form to be used by Promoter Members, Participants and Adopters in disclosing the above, which form shall be consistent with the terms of this Section 2.

3.    **Grant of Rights. (a)  Royalty Free License**. Effective upon the approval of Proposed Specifications to become Adopted Specifications and subject to the right of a Promoter Member, Participant or Adopter to negotiate the terms and conditions of licensing Necessary Claims as set forth in **subsections (b)** and **(c)** below, each Promoter Member, Participant and Adopter shall grant to the Alliance and other Promoter Members, Participants and Adopters, a Royalty Free License to any Necessary Claims of such Promoter Member, Participant or Adopter with respect to any products that Fully Comply with the applicable Adopted Specifications.

**(b)    Disclosure and Negotiation**. Prior to the expiration of the Disclosure Period (as set forth in Section 2 above), a Promoter Member, Participant or Adopter may elect in writing to not grant a Royalty Free License to any Necessary Claims of such Promoter Member, Participant, Adopter, Affiliate or Non-Member, as applicable, and, in such case, the Promoter Member, Participant or Adopter shall disclose in writing to the Board of Directors: (i) all portion(s) of the Proposed Specifications which involve any Necessary Claims (including without limitation, any Necessary Claims of an Affiliate or a Non-Member); and (ii) any terms and conditions applicable to the license of such Necessary Claims (including without limitation, any Necessary Claims of an Affiliate or a Non-Member).  If required, the Board of Directors and the Promoter Member, Participant, Adopter, Affiliate or Non-Member, as applicable, will negotiate such terms and conditions to final resolution or determine that mutually acceptable license terms and conditions cannot be reached.  In the event the Board of Directors and a Promoter Member, Participant, Adopter, Affiliate or Non-Member mutually agree to license any applicable Necessary Claims on a fee-based arrangement, such Promoter Member, Participant, Adopter, Affiliate or Non-Member agrees that notwithstanding **subsection (a)**, any existing and future Royalty Free Licenses granted to it in connection with any Necessary Claims in existing or future Proposed Specifications or Adopted Specifications by other Promoter Members, Participants, Adopters, Affiliates and/or Non-Members may be converted to a fee-based license arrangment

as determined by such other Promoter Member, Participant, Adopter, Affiliate or Non-Member owning the applicable Necessary Claims.

(c)    **Withdrawal.** If the Board of Directors and the applicable Promoter Member, Participant, Adopter, Affiliate or Non-Member cannot reach agreement on the terms and conditions of the license of Necessary Claims, the portion(s) of the Proposed Specifications that involve the Necessary Claims shall be removed from the applicable Proposed Specifications.

(d)    **Effect of Withdrawal.** The terms of **Section 2** and **3** of this IPR Policy shall not apply to any portions of Proposed Specifications that involve Necessary Claims which have been expressly identified and affirmatively withdrawn from the Proposed Specifications by a Promoter Member, Participant, Adopter, Affiliate or Non-Member.

4.    **Necessary Claims to Existing Adopted Specifications.** Upon joining the Alliance, each Promoter Member, Participant and Adopter shall grant to the Alliance and other Promoter Members, Participants and Adopters, a Royalty Free License to any Necessary Claims of such joining Promoter Member, Participant or Adopter relating to Adopted Specifications existing prior to the effective date of such Promoter Member, Participant or Adopter joining the Alliance.

5.    **Alliance IPR and IPR Contributed to the Alliance.** All right, title and interest in and to any and all IPR, software and documentation created or developed by individuals employed or retained by the Alliance shall vest in the Alliance ("*Alliance IPR*"), and the Alliance shall be free to use and publish any research results, ideas, algorithms, techniques and other information developed for or by the Alliance as determined by the Board of Directors. Promoter Members, Participants and Adopters shall have a Royalty Free License to Alliance IPR.

6.    **Joint IPR.** IPR developed jointly by the Alliance and either: (a) a Promoter Member, Participant and/or Adopter pursuant to a separate agreement with the Alliance defining the scope of the work to be performed by Promoter Member, Participant and/or Adopter; or (b) a contractor acting in their capacity as such shall be jointly owned by the Alliance and the applicable Promoter Member, Participant and/or Adopter ("*Joint IPR*"). Each joint owner shall be entitled to exercise all rights of ownership as provided by law without, however, an obligation of accounting from one to the other. The Promoter Member, Participant and/or Adopter acknowledges and agrees that the Alliance will make Joint IPR available to Promoter Members, Participants and Adopters pursuant to terms and conditions determined by the Board of Directors. For the purposes of the foregoing, the term "jointly" shall mean that at least one Promoter Member, Participant and/or Adopter employee and one Alliance employee or contractor assigned to the Alliance qualify as co-inventors as a matter of U.S. patent law, in the case of patentable sub

ject matter, or qualify as co-authors as a matter of U.S. copyright law, in the case of copyrightable subject matter.

7.    **Clearinghouse Activities**. The Alliance may serve, upon such terms and conditions as may be established by the Board of Directors, as a clearinghouse for the purposes of collecting and distributing any royalties or license fees due to any applicable Promoter Members, Participants, Adopters and/or Non-Members in connection with the licensure and/or use of Adopted Specifications.

## 8. Definitions.

"*Adopted Specifications*" means the Specifications that have been approved or adopted by the Alliance pursuant to the procedures set forth in the Corporate Bylaws.

"*Adopter*" means any non-Promoter Member and non-Participant participant in the Alliance which has executed the ZigBee Adopter Agreement.

"*Alliance IPR*" is defined in **Section 5**. "*Fully Comply*" means products or technology that meet all mandatory portions of the applicable Adopted Specifications. If the Adopted Specifications contain optional components, and the product or technology incorporates the optional components, then the products or technology must also meet the optional specifications of such Adopted Specifications.

"*Interfaces*" means a set of message and message sequences on the information flowing across a reference point between two identified functional entities or the method by which information, including data and control information, is conveyed between cooperative systems or devices, such as radio frequency communications-related subsystems.

"*IPR*" means intellectual property rights, whether by patent, copyright, trade secret or other form of intellectual property.

"*Joint IPR*" is defined in **Section 6**.

"*Necessary Claims*" means those claims of all patents and patent applications throughout the world, existing now or hereafter issued or filed, that a Promoter Member, Participant and Adopter, or a Non-Member, as applicable, owns or has a right to, and that: (a) cover or directly relate to one or more of the Proposed Specifications and/or the Adopted Specifications, as applicable; and (b) would be necessarily infringed by an implementation of any Proposed Specifications, if approved as Adopted Specifications, and/or Adopted Specifications, as applicable, where such infringement could not have been avoided by another commercially reasonable non-infringing implementation of such Proposed Specifications and/or

EXHIBIT 2-A

October 14, 2005 – Version 1.0 Adopted Specification IPR Version 1.1

Adopted Specifications, as applicable, and such infringement is necessary to meet the implementation requirements of the Proposed Specifications and/or Adopted Specifications, as applicable. Necessary Claims shall not include any claims of any patents or patent applications covering any enabling technologies that are used in the manufacture of products that comply with the Proposed Specifications and/or Adopted Specifications, but are not expressly designated in the Proposed Specifications and/or Adopted Specifications (*e.g.*, semiconductor manufacturing technology, compiler technology, object oriented technology, basic operating system technology, etc.). If a Promoter Member, Participant and/or Adopter asserts that any claim is not a Necessary Claim on the basis that there is a commercially reasonable alternative to the infringing implementation of the Adopted Specification, such Promoter Member, Participant or Adopter shall provide the Board of Directors with sufficient documentation evidencing the availability of such a commercially reasonable alternative.

*"Non-Member"* means any entity which is not a Promoter Member, Participant or Adopter of the Alliance.

*"Participant"* means any participant in the Alliance which has executed the Zig-Bee Participation Agreement.

*"Promoter Member"* means any participant in the Alliance which has executed the ZigBee Promoter Member Agreement.

*"Proposed Specifications"* means Specifications and/or any additions and/or modifications to existing Adopted Specifications (but not the underlying Adopted Specifications) recommended for review to the Alliance by the Board of Directors.

*"Royalty Free License"* means a no cost, worldwide, perpetual, non-exclusive, non-transferable, unrestricted license to the Necessary Claims, as applicable, but does not include any right to grant sublicenses, solely to make, have made, use, import, sell, offer to sell, license, promote or otherwise distribute and dispose of the resulting product or technology.

*"Specifications"* means documents or specifications that define or specify one or more aspects of an Interface. Interfaces may be defined and/or specified by using either message oriented descriptions or a protocol specification.

*"Subsequent Adopted Specifications"* means those Adopted Specifications other than the Version 1.0 Adopted Specifications.

*Version 1.0 Adopted Specifications"* means those certain Adopted Specifications approved    by    the    Alliance    on    or    about    December    9,    2004.

EXHIBIT 2-A

Page 5 of 5

1084

October 14, 2005 – Version 1.0 Adopted Specification IPR Version 1.1

EXHIBIT 2-B

# ZIGBEE ALLIANCE

## INTELLECTUAL PROPERTY RIGHTS POLICY

### (Governing ZigBee Subsequent Adopted Specifications)

The IPR of the Alliance and its Members for Subsequent Adopted Specifications shall be governed by the policy set forth herein ("*IPR Policy*"). The IPR of the Alliance and its Members for Version 1.0 Adopted Specifications shall be governed by the Intellectual Property Rights Policy for Version 1.0 Adopted Specifications. Recognizing that the Alliance is an open participation organization whose activities are focused on encouraging the rapid advancement of interface Specifications for consumer electronics, home and building automation, industrial controls, PC peripherals, medical sensor applications, toys and other related applications, this IPR Policy is designed to maximize widespread adoption of Specifications. In furtherance of the objective of widespread adoption, the Alliance and its Members agree that barriers to industry use of Adopted Specifications should be limited as much as possible. Capitalized terms used in this Exhibit are defined in **Section 8** of this Exhibit or the applicable Member Agreement.

1.    **IPR Categories.** IPR shall be categorized as follows:

   (a) Adopted Specifications;
   (b) Alliance IPR; and
   (c) Joint IPR

with each category subject to the further terms set forth in this IPR Policy.

2.    **Optional Disclosure of Necessary Claims.**

Each Member may, but shall not be required to, disclose whether such Member has any Necessary Claims (including without limitation, any Necessary Claims of an Affiliate of a Member and/or a Non-Member) relating to the applicable Proposed Specifications or Adopted Specifications. The Alliance shall develop a declaration form to be used by Members in disclosing the above, which form shall be consistent with the terms of this **Section 2**.

3.    **RAND License for Necessary Claims in Subsequent Adopted Specifications.**
Each Member agrees to grant to each other Member a RAND License to any Necessary Claims in any Subsequent Adopted Specifications upon such terms and conditions as may

be agreed to between such Members.  If a Member ("*Licensor Member*") licenses to another Member ("*Licensee Member*") any Necessary Claims on a fee-based or other royalty-based arrangement, Licensor Member agrees that any existing and future licenses granted to it in connection with any Necessary Claims in existing or future Adopted Specifications by Licensee Member, including, without limitation, any Royalty Free Licenses or other non-fee based arrangements, may be converted to a fee-based or other royalty-based license arrangement as determined by the Licensee Member.

4.    **Necessary Claims to the Version 1.0 Adopted Specifications.**  Subject to a Member's right to convert its licensed Necessary Claims to a fee-based or other royalty-based arrangement as set forth in **Section 3** above, upon joining the Alliance, each Member shall grant to the Alliance and other Members, a Royalty Free License to any Necessary Claims of such joining Member in the Version 1.0 Adopted Specifications.

5.    **Alliance IPR and IPR Contributed to the Alliance.**  All right, title and interest in and to any and all IPR, software and documentation created or developed by individuals employed or retained by the Alliance shall vest in the Alliance ("*Alliance IPR*"), and the Alliance shall be free to use and publish any research results, ideas, algorithms, techniques and other information developed for or by the Alliance as determined by the Board of Directors.  Members shall have a Royalty Free License to Alliance IPR.

6.    **Joint IPR.**  IPR developed jointly by the Alliance and either: (a) a Member pursuant to a separate agreement with the Alliance defining the scope of the work to be performed by such Member; or (b) a contractor acting in their capacity as such shall be jointly owned by the Alliance and the applicable Member ("*Joint IPR*").  Each joint owner shall be entitled to exercise all rights of ownership as provided by law without, however, an obligation of accounting from one to the other.  The Member acknowledges and agrees that the Alliance will make Joint IPR available to all Members pursuant to terms and conditions determined by the Board of Directors.  For the purposes of the foregoing, the term "jointly" shall mean that at least one Member employee and one Alliance employee or contractor assigned to the Alliance qualify as co-inventors as a matter of U.S. patent law, in the case of patentable subject matter, or qualify as co-authors as a matter of U.S. copyright law, in the case of copyrightable subject matter.

7.    **Clearinghouse Activities.**  The Alliance may serve, upon such terms and conditions as may be established by the Board of Directors, as a clearinghouse for the purposes of collecting and distributing any royalties or license fees due to any applicable Members and/or Non-Members in connection with the licensure and/or use of Adopted Specifications.

EXHIBIT 2-B

Page 2 of 4

952

## 8. Definitions.

"*Adopted Specifications*" means the Specifications that have been approved or adopted by the Alliance pursuant to the procedures set forth in the Corporate By-laws.

"*Adopter*" means any non-Promoter Member and non-Participant participant in the Alliance which has executed the ZigBee Adopter Agreement.

"*Alliance IPR*" is defined in **Section 5**.

"*Fully Comply*" means products or technology that meet all mandatory portions of the applicable Adopted Specifications. If the Adopted Specifications contain optional components, and the product or technology incorporates the optional components, then the products or technology must also meet the optional specifications of such Adopted Specifications.

"*Interfaces*" means a set of message and message sequences on the information flowing across a reference point between two identified functional entities or the method by which information, including data and control information, is conveyed between cooperative systems or devices, such as radio frequency communications-related subsystems.

"*IPR*" means intellectual property rights, whether by patent, copyright, trade secret or other form of intellectual property.

"*Joint IPR*" is defined in **Section 6**.

"*Licensee Member*" is defined in **Section 3**.

"*Licensor Member*" is defined in **Section 3**.
"*Member*" means any Promoter Member, Participant or Adopter, collectively or individually, as applicable.

"*Necessary Claims*" means those claims of all patents and patent applications throughout the world, existing now or hereafter issued or filed, that a Member or a Non-Member, as applicable, owns or has a right to, and that: (a) cover or directly relate to one or more of the Proposed Specifications and/or the Adopted Specifications, as applicable; and (b) would be necessarily infringed by an implementation of any Proposed Specifications, if approved as Adopted Specifications, and/or Adopted Specifications, as applicable, where such infringement could not have been avoided by another commercially reasonable non-infringing implementation of such Proposed Specifications and/or Adopted Specifications, as applicable, and such infringement is necessary to meet the implementation requirements

**EXHIBIT 2-B**

October 14, 2005 – Subsequent Specification IPR Version 1.3

of the Proposed Specifications and/or Adopted Specifications, as applicable. Necessary Claims shall not include any claims of any patents or patent applications covering any enabling technologies that are used in the manufacture of products that comply with the Proposed Specifications and/or Adopted Specifications, but are not expressly designated in the Proposed Specifications and/or Adopted Specifications (*e.g.*, semiconductor manufacturing technology, compiler technology, object oriented technology, basic operating system technology, etc.). If a Member asserts that any claim is not a Necessary Claim on the basis that there is a commercially reasonable alternative to the infringing implementation of the Adopted Specification, such Member shall provide the Board of Directors with sufficient documentation evidencing the availability of such a commercially reasonable alternative.

*"Non-Member"* means any entity which is not a Promoter Member, Participant or Adopter of the Alliance.

*"Participant"* means any participant in the Alliance which has executed the ZigBee Participation Agreement.

*"Promoter Member"* means any participant in the Alliance which has executed the ZigBee Promoter Member Agreement.

*"Proposed Specifications"* means Specifications and/or any additions and/or modifications to existing Adopted Specifications (but not the underlying Adopted Specifications) recommended for review to the Alliance by the Board of Directors.

*"RAND License"* means a non-exclusive license on fair, reasonable and non-discriminatory terms and conditions, without a right to sublicense, to make, have made, use, import sell, offer to sell, license, promote or otherwise distribute and dispose of the resulting product or technology that Fully Comply with the applicable Subsequent Adopted Specifications. Such RAND License to Necessary Claims shall be transferable by the licensee only with the written consent of the licensor, such consent may not be unreasonably withheld or delayed.

*"Royalty Free License"* means a no cost, worldwide, perpetual, non-exclusive, non-transferable, unrestricted license to the Necessary Claims, as applicable, but does not include any right to grant sublicenses, solely to make, have made, use, import, sell, offer to sell, license, promote or otherwise distribute and dispose of the resulting product or technology.

*"Specifications"* means documents or specifications that define or specify one or more aspects of an Interface. Interfaces may be defined and/or specified by using either message oriented descriptions or a protocol specification.

*"Subsequent Adopted Specifications"* means those Adopted Specifications other than the Version 1.0 Adopted Specifications.

*"Version 1.0 Adopted Specifications"* means those certain Adopted Specifications approved by the Alliance on or about December 9, 2004

# EXHIBIT 3

# ZIGBEE ALLIANCE

# ANTITRUST GUIDELINES

Certain types of activities conducted by industry participants may be subject to scrutiny under antitrust laws as being anti-competitive. In order to minimize exposure of the Alliance and its Promoter Members and Participants to antitrust liability, the Alliance and each Promoter Member and Participant agree to abide by the following guidelines when participating with, for or on behalf of the Alliance:

1.  Neither the Alliance nor any of its committees shall be used for the purpose of bringing about or attempting to bring about any understanding or agreement, written or oral, formal or informal, express or implied, among and between competitors with regard to prices, terms or conditions of sale, distribution, volume of production, territories, customers, credit terms or marketing practices.

2.  The Alliance and its Promoter Members and Participants shall not discuss, communicate or engage in any other exchange between Promoter Members and/or Participants with regard to prices, pricing methods, production quotas or other limitations on either the timing, costs or volumes of production or sale, or allocation of territories or customers.

3.  Neither the Alliance nor its Promoter Members and/or Participants shall engage in any activity or communication that might be construed as an attempt to prevent any person or business entity from gaining access to any market or customer for goods and services, or to prevent any business entity from obtaining a supply of goods or services or otherwise purchasing goods or services freely in the market.

4.  The qualifications for membership or participation in the Alliance are set forth in the Corporate Documents. No applicant for membership or participation, who otherwise meets the qualifications set forth therein, shall be rejected for any anti-competitive purpose or for the purpose of denying such applicant the benefits of membership or participation.

5.  The Alliance shall not compel or coerce any Promoter Member and/or Participant into accepting or complying with any Adopted Specification.

6.  Adherence to Adopted Specifications or sample implementations shall be voluntary on the part of the Promoter Members and Participants of the Alliance and shall in no way be compelled, directed or coerced by the Alliance, it being solely a voluntary decision on the part of the particular Promoter Member and/or Participant of the Alliance as to whether to adhere

EXHIBIT 3
Page 1 of 2

Rev-Nov-2005

to or comply with any such Adopted Specifications or sample implementations.

7.   Any Adopted Specifications or sample implementations shall be based solely and exclusively upon technical considerations and upon the merits of objective judgments and thorough procedures and shall in no way be based upon any effort, intention or purpose of any of its Promoter Members and Participants to reduce or eliminate competition in the sale, supply and furnishing of products and services.

8.   If information, materials or reports of the Alliance for the use of the membership or participation is significant to third parties or others in the industry, then such information, material and reports will be made available by the Alliance to all such persons, on such reasonable terms and conditions as it may prescribe, in order to carry out its purposes.

9.   To the extent that the purposes of the Alliance, as set forth in its Corporate Documents require, for the Alliance's purposes and objectives, joint research and development by two or more of its Promoter Members and/or Participants, or representatives thereof, any such joint research and development for the Alliance shall exclude the following activities:

- the exchange of information among competitors relating to costs, sales, profitability, prices, marketing or distribution of any product, process, or service that is not reasonably required to conduct the research and development;

- any agreement or any other conduct restricting, requiring, or otherwise involving the production or marketing by any Promoter Member and/or Participant of the Alliance of any product, process or service, other than the production or marketing of proprietary information developed through such joint research and development, such as patents and trade secrets; and

- any agreement or any other conduct restricting or requiring the sale, licensing or sharing of inventions or developments not developed through such joint research and development, or restricting or requiring participation by any Promoter Member and/or Participant of the Alliance in other research and development activities, that is not reasonably required to prevent misappropriation of proprietary information contributed by any Promoter Member and/or Participant of the Alliance, or representative thereof, or of the results of such joint research and development.

EXHIBIT 3
Page 2 of 2